# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

PAUL EDWARD WEBER,                    :
                                      :
            Petitioner,               :
                                      :
      v.                              :        Civ. Act. No. 13-283-LPS
                                      :
ROBERT MAY, Warden, and               :
ATTORNEY GENERAL OF THE               :
STATE OF DELAWARE,                    :
                                      :
            Respondents.[1]           :

---

## MEMORANDUM OPINION

Paul Edward Weber. *Pro so* Petitioner.

Andrew J. Vella, Deputy Attorney General of the Delaware Department of Justice, Wilmington, Delaware.  Attorney for Respondents.

September 30, 2022
Wilmington, Delaware

---

[1]Warden Robert May replaced former Warden Dana Metzger, an original party.  *See* Fed. R. Civ. P. 25(d).

STARK, U.S. Circuit Judge:

## I.     INTRODUCTION

Pending before the Court is a Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C.

§ 2254 and two amended Petitions (hereinafter collectively referred to as "Petition") filed by

Petitioner Paul Edward Weber ("Petitioner").  (D.I. 1; D.I. 58; D.I. 63; D.I. 113)  The Petition

presents 17 claims for relief based on alleged violations of several federal constitutional principles

and the alleged misinterpretation and misapplication of Delaware sentencing law.  The State filed

Answers in Opposition, to which Petitioner filed a Reply.  (D.I. 12;  DI. 77; D.I. 94; D.I. 105)  For

the reasons discussed, the Court will dismiss the Petition because the claims are either meritless,

procedurally barred, or not cognizable on federal habeas review.

## II.    BACKGROUND

In 2001, a Delaware Superior Court jury convicted Petitioner of second degree forgery and

misdemeanor theft due to his forgery of a check for $300.  *See Weber v. State*, 812 A.2d 225 (Table),

2002 WL 31235418, at *1 (Del. Oct. 4, 2002); *Weber v. State*, 197 A.3d 492 (Table), 2018 WL

5993473, at *1 (Del. Nov. 13, 2018).  The Superior Court sentenced him to 30 days of imprisonment

at Level V for each conviction.  *See Weber*, 2002 WL 31235418, at *1.  Petitioner appealed his

convictions and sentences to the Delaware Supreme Court, which dismissed the appeal for lack of

jurisdiction because Petitioner's term of imprisonment for each conviction did not exceed one

month.  *See id.*

Thereafter, on August 18, 2004,

> at approximately 10:00 p.m., 74 year old Frederick Naspo stopped to
> refuel his car at the Shell gas station on the corner of Kirkwood
> Highway and Duncan Road, in New Castle County.  As Naspo got out
> to pump gas, a man with a cigarette behind his ear approached him at
> the pump.  Naspo said, "Good evening," and asked the man whether
> he intended to smoke near the gas pump.  According to Naspo, the

man replied, "No, I'm going to take your car." With both hands, the man grabbed for Naspo's car keys, twice telling Naspo that he had a gun. Failing to get the car keys, the man ran away. Naspo had the gas station attendant call the police.

At 10:13 p.m., Delaware State Police Sergeant Mark Hawk responded to the Shell gas station and met with Naspo. Naspo told Hawk that his assailant was a white male, about 35 years old and approximately five feet eight inches tall, 160 pounds, wearing jeans and a loose fitting blue shirt. While speaking with Naspo, Hawk learned that police had a suspect detained in the parking lot of a nearby Sleepy's mattress store, about a block and a half away. The suspect appeared to match Naspo's description of his assailant.

Hawk drove Naspo to the Sleepy's parking lot for a showup identification of the detained suspect, who was [Petitioner], a man whom Hawk had encountered several times before, dating back to 1984. Naspo viewed [Petitioner] from the backseat of Hawk's patrol vehicle. To Naspo, it appeared that [Petitioner] wore military fatigues; however, at trial Hawk testified that [Petitioner] had worn blue jeans and an oversized blue shirt. Unconvinced that [Petitioner] was his assailant, Naspo told police that [Petitioner] was not the man that assaulted him. Police released [Petitioner] and drove him home.

That same night, Hawk interviewed the Shell gas station attendant and learned that the gas station had a video surveillance system. Because the attendant did not have access to the surveillance system, Hawk would have to return in the morning to view the tapes. On August 19, 2004, at around 10:00 a.m., Hawk returned to the gas station and viewed the video surveillance tape. Upon reviewing the footage, Hawk recognized that Naspo's assailant was [Petitioner]. Hawk testified that the man in the video had the same facial features as [Petitioner], and wore the same clothing Petitioner had worn when he was detained in the Sleepy's parking lot: an oversized blue shirt and blue jeans.

Hawk went to [Petitioner's] residence with an arrest warrant and arrested [Petitioner] in his bedroom. At the time, [Petitioner] wore nothing but his underwear, so Hawk grabbed a pair of blue jeans and a blue shirt from the floor of [Petitioner's] bedroom. The police transported [Petitioner] to Troop 2 for booking and processing.

*Weber v. State*, 38 A.3d 271, 273-74 (Del. 2012).

Petitioner was indicted on charges of attempted first degree robbery and attempted first degree carjacking. *See Weber v. State*, 971 A.2d 135, 140 (Del. 2009). In 2005, a Delaware Superior Court jury convicted him of both charges, and he was sentenced as an habitual offender to a total of 28 years of imprisonment at Level V (25 years for the robbery conviction and three years for the carjacking conviction). *See id.* On appeal, the Delaware Supreme Court affirmed Petitioner's conviction for attempted first degree carjacking, but reversed his conviction for attempted first degree robbery, and remanded the case back to the Superior Court for a new trial. *See id.* at 142 (hereinafter "*Weber I*"). In 2010, the State retried Petitioner for attempted first degree robbery, and a Delaware Superior Court jury convicted him of that offense. *See Weber v. State*, 38 A.3d 271, 274 (Del. 2012) (hereinafter "*Weber II*"). The State moved to declare Petitioner an habitual offender, and the Superior Court granted that motion following a hearing. *See id.* Petitioner's felony conviction in 2001 for forging a $300 check served as one of the predicate offenses for Petitioner's habitual offender status. *See Weber*, 2018 WL 5993473, at *1. Petitioner was subsequently sentenced to 25 years of imprisonment at Level V for the robbery conviction. The Delaware Supreme Court affirmed Petitioner's convictions and sentence on February 21, 2012. *See Weber II*, 38 A.3d at 278. Petitioner petitioned the United States Supreme Court for a writ of certiorari, which the Supreme Court denied on October 1, 2012. *See Weber v. Delaware*, 568 U.S. 865 (2012).

In February 2013, the attorney who represented Petitioner in his Delaware criminal trial and direct appeal ("defense counsel") filed the first Petition in this proceeding, which asserted eight claims for relief. (D.I. 1) On August 6, 2013, Petitioner, acting *pro se*, filed in the Delaware Superior Court a motion for postconviction relief pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 motion"), alleging that defense counsel was ineffective at trial and on direct appeal. (D.I. 11-4) Petitioner, however, informed the Superior Court that he wished defense counsel to continue

representing him in the instant federal habeas proceeding. *Id.* The State filed a motion to stay the instant proceeding due to the possible conflict of interest and also filed an Answer to the original petition. (D.I. 11; D.I. 12) Defense counsel filed a reply opposing a stay. (D.I. 15) After considering additional briefing, the Honorable Sue L. Robinson (now retired) granted the motion to stay on July 1, 2014. (D.I. 21) Recognizing the conflict of interest caused by defense counsel's representation of Petitioner in his Rule 61 proceeding, the Delaware Superior Court stayed Petitioner's Rule 61 proceeding and attempted to appoint conflict counsel to represent Petitioner. (D.I. 78-1 at 33-34, Entry Nos. 204, 205)

In June 2015, defense counsel filed in this Court a document titled "Petition for Expungement via Habeas Corpus, Coram Nobis, and/or Audita Querala" ("petition for expungement") which initiated the opening of another civil action. *See Weber v. Pierce*, 2015 WL 7306119, at *1 (D. Del. Oct. 29, 2015). In the petition for expungement, defense counsel argued that Petitioner's 2001 second degree forgery conviction was unconstitutional and should not have been used to enhance Petitioner's 2010 sentence for attempted first degree robbery. *Id.* Judge Robinson denied the petition for expungement for two reasons: (1) the Court did not have jurisdiction to issue a writ of coram nobis or a writ of audita querala for Petitioner's 2001 Delaware forgery conviction, because those writs are generally limited to challenging federal convictions; and (2) the Court lacked jurisdiction over the proceeding to the extent the expungement petition was brought pursuant to 28 U.S.C. § 2254, because Petitioner was no longer "in custody" for the 2001 forgery conviction. *See id.*

Meanwhile, defense counsel continued to file motions in Petitioner's Delaware state post-conviction proceedings in an attempt to challenge the use of his forgery conviction as a predicate offense that qualified him as an habitual offender. The Superior Court denied all of those motions,

(D.I. 77 at 1-2), and the Delaware Supreme Court affirmed those decisions. *See Weber v. State*, 113 A.3d 1081 (Table), 2015 WL 2329160 (Del. May 12, 2015).  Thereafter,  acting *pro se*, Petitioner sought a writ of mandamus from the Delaware Supreme Court to order the Superior Court to allow him to successfully challenge his 2001 second degree forgery conviction.  *See Matter of Weber*, 189 A.3d 184 (Table), 2018 WL 2446803 (Del. May 30, 2018).  The Delaware Supreme Court dismissed his mandamus petition.  *Id.*

In April 2016, the Superior Court appointed conflict counsel to represent Petitioner in his Rule 61 proceeding.  (D.I. 78-1 at 40-41, Entry No. 269)  Conflict counsel filed an amended Rule 61 motion on March 24, 2017.  (D.I. 78-1 at 42, Entry No. 281)  The Superior Court denied the amended Rule 61 motion on March 6, 2018, and the Delaware Supreme Court affirmed that decision on November 13, 2018.  (D.I. 78-9; D.I. 78-11; *see also Weber v. State*, 2018 WL 5993473 (Del. Nov. 13, 2018).

On February 28, 2019, the Court lifted the stay in this case.  (D.I. 52)  Petitioner filed an amended Petition on April 10, 2019, and then filed a motion to amend the amended Petition on April 16, 2019.  (D.I. 58; D.I. 63)  The Court granted the motion to amend, and ordered the State to answer the issues in the original Petition, the amended Petition, and the second amended Petition. (D.I. 65)  The State filed its Answer on September 6, 2019.  (D.I. 77)  Thereafter, Petitioner filed eight discovery-like motions; the Court granted only Petitioner's Motion to Expand the Record. (D.I. 74; D.I. 92)  After granting the Motion to Expand the Record, the Court ordered the State to file a supplemental Answer to Claim Thirteen of the Petition and any claim related to related to Delaware Supreme Court orders issued in 2019.  (D.I. 92)  The State filed a Supplemental Answer on February 3, 2020.  (D.I. 94)  Petitioner filed a Traverse on June 1, 2020.  (D.I. 105)

III.   **GOVERNING LEGAL PRINCIPLES**

A.   **Exhaustion and Procedural Default**

Absent exceptional circumstances, a federal court cannot grant habeas relief unless the

petitioner has exhausted all means of available relief under state law.  *See* 28 U.S.C. § 2254(b);

*O'Sullivan v. Boerckel*, 526 U.S. 838, 842-44 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971).  The

AEDPA states, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> unless it appears that —
>
> (A) the applicant has exhausted the remedies available in the courts of
> the State; or
>
> (B)(i)  there is an absence of available State corrective process; or
>   (ii) circumstances exist that render such process ineffective to
>   protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The exhaustion requirement is based on principles of comity, requiring a petitioner to give

"state courts one full opportunity to resolve any constitutional issues by invoking one complete

round of the State's established appellate review process."  *O'Sullivan*, 526 U.S. at 844-45; *see also*

*Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000).  A petitioner satisfies the exhaustion requirement

by demonstrating that the habeas claims were "fairly presented" to the state's highest court, either

on direct appeal or in a post-conviction proceeding, in a procedural manner permitting the court to

consider the claims on their merits.  *See Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005); *Castille v. Peoples*,

489 U.S. 346, 351 (1989).

A petitioner's failure to exhaust state remedies will be excused if state procedural rules

preclude him from seeking further relief in state courts.  *See Lines v. Larkins*, 208 F.3d 153, 160 (3d

Cir. 2000); *Teague v. Lane*, 489 U.S. 288, 297-98 (1989). Although treated as technically exhausted, such claims are nonetheless procedurally defaulted. *See Lines*, 208 F.3d at 160; *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991). Similarly, if a petitioner presents a habeas claim to the state's highest court, but that court "clearly and expressly" refuses to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted. *See Coleman*, 501 U.S. at 750; *Harris v. Reed*, 489 U.S. 255, 260-64 (1989).

Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *See McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999); *Coleman*, 501 U.S. at 750-51. To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, a petitioner must show "that [the errors at trial] worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Alternatively, a federal court may excuse a procedural default if the petitioner demonstrates that failure to review the claim will result in a fundamental miscarriage of justice. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Wenger v. Frank*, 266 F.3d 218, 224 (3d Cir. 2001). A petitioner demonstrates a miscarriage of justice by showing a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496. Actual innocence means factual innocence, not legal insufficiency. *See Bousley v. United States*, 523 U.S. 614, 623 (1998). In order to establish actual innocence, the petitioner must present new reliable evidence – not presented at trial – that demonstrates "it is more likely than not that no reasonable juror would have

7

found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 537-38 (2006); *see also Sweger v. Chesney*, 294 F.3d 506, 522-24 (3d Cir. 2002).

## B. Standard of Review

If a state's highest court adjudicated a federal habeas claim on the merits, the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d).  Pursuant to 28 U.S.C. § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the trial.  28 U.S.C. § 2254(d)(1) & (2); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001).  A claim has been "adjudicated on the merits" for the purposes of 28 U.S.C. § 2254(d) if the state court decision finally resolves the claim on the basis of its substance, rather than on a procedural or some other ground.  *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009). The deferential standard of § 2254(d) applies even "when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).  As recently explained by the Supreme Court, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99.

Finally, when reviewing a habeas claim, a federal court must presume that the state court's determinations of factual issues are correct.  *See* 28 U.S.C. § 2254(e)(1).  This presumption of correctness applies to both explicit and implicit findings of fact, and is only rebutted by clear and convincing evidence to the contrary.  *See* 28 U.S.C. § 2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) (stating that clear and convincing

standard in § 2254(e)(1) applies to factual issues, whereas unreasonable application standard of

§ 2254(d)(2) applies to factual decisions).

## IV.   DISCUSSION

The Court views the "Petition" for habeas relief in this case as consisting of the original

Petition (D.I. 1), the first Amended Petition (D.I. 58), the second Amended Petition (D.I. 63), and

the Supplement to Petitioner's second Amended Petition expanding on Claim Twelve (D.I. 113).

The Petition asserts the following 17 grounds for relief: (1) the Delaware Supreme Court violated

Petitioner's right to be protected from double jeopardy by remanding his attempted first degree

robbery charge rather than acquitting him on that charge; (2) the State engaged in prosecutorial

misconduct which denied Petitioner his right to due process and a fair trial; (3) the Superior Court's

improper *voir dire* and colloquy about Petitioner's potential defenses and intent to testify violated his

right to due process and a fair trial; (4) Petitioner was denied his right to "jury lenity" because the

jury evaluating the attempted robbery charge was not made aware of Petitioner's conviction for

carjacking; (5) there was insufficient evidence to support the verdict; (6) the Superior Court violated

Petitioner's due process/fair trial right and his right to be protected against double jeopardy by

giving incomplete jury instructions on the elements of the offenses; (7) the Superior Court violated

Petitioner's due process right to a fair trial and his right to be protected against double jeopardy by

giving incomplete jury instructions on Petitioner's possible defenses; (8) the cumulative punishments

imposed for Petitioner's attempted first degree carjacking and attempted first degree robbery

convictions violated his right to be protected from double jeopardy; (9) the plea bargain negotiations

deprived Petitioner of his right to a fair trial, and also subjected him to selective or vindictive

prosecution; (10) there was insufficient evidence to support the identification of Petitioner, and the

State engaged in a suggestive identification process; (11) the State breached its duty to preserve

evidence; (12) defense counsel provided ineffective assistance and violated Petitioner's right to client autonomy by failing to pursue a renunciation defense and/or request a renunciation instruction; (13) Petitioner was deprived of his right to due process because he could not challenge his 2001 conviction for second degree forgery; (14) Petitioner's inability to challenge his 2001 conviction for second degree forgery violated his right to equal protection because the forgery offense could have been prosecuted as a misdemeanor offense; (15) defense counsel provided ineffective assistance by incorrectly advising Petitioner that he was not eligible for treatment as an habitual offender; (16) Petitioner's conviction for attempted robbery did not qualify him for treatment as an habitual offender; and (17) defense counsel's general ineffective assistance deprived Petitioner of his rights to a fair trial, due process, and equal protection.

### A. Claim One: Double Jeopardy

In Claim One, Petitioner contends that his right to be protected from double jeopardy was violated when the Delaware Supreme Court remanded his first degree robbery charge back to the Superior Court rather than acquitting him on that charge. According to Petitioner, the Delaware Supreme Court's reversal of his attempted robbery conviction in *Weber I* amounted to an acquittal and barred his retrial on the charge of attempted robbery. He specifically contends that: (1) double jeopardy bars a retrial where the State initially fails to present insufficient evidence of guilt; and (2) the "Delaware Supreme Court's finding that there was sufficient evidence to support an acquittal of the offense amounts to a *de facto* acquittal, . . . and is the equivalent of a judicial acquittal for double jeopardy purposes." (D.I. 1 at 30)

In its 2013 Answer to Petitioner's original Petition, the State correctly asserted that Claim One was procedurally defaulted because the double jeopardy argument presented in the original Petition was different from the double jeopardy argument Petitioner asserted on direct appeal. (D.I.

12 at 5 n.2)  In its Answer filed in 2019, the State incorporates the 2013 Answer for its responses to Claims One through Eleven.  Since 2013, however, Petitioner has filed a variety of motions in the Delaware Superior Court, and he presented the instant double jeopardy argument in a Rule 35 motion to vacate sentence that was filed sometime in 2013 or 2014.  (*See* D.I. 78-1 at 29-33)  The Superior Court denied the double jeopardy argument as meritless, and the Delaware Supreme Court affirmed that decision.  *See State v. Weber*, 2014 WL 4167492, at *4 (Del. Super. Ct. July 29, 2014); *Weber v. State*, 113 A.3 1081 (Table), 2015 WL 2329160, at *2 (Del. May 12, 2015).  Given these developments, the State's reliance on its earlier assertion of procedural default with respect to Claim One is unavailing.

Since the Delaware Supreme Court eventually adjudicated Claim One on the merits, when it affirmed the Superior Court's denial of Petitioner's Rule 35 motion, Claim One will only warrant relief if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

"The Double Jeopardy Clause bars retrial following a court-decreed acquittal, even if the acquittal is 'based upon an egregiously erroneous foundation.'"  *Evans v. Michigan*, 568 U.S. 313, 318 (2013).  The Supreme Court has "defined an acquittal to encompass any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense."  *Id.*  As a result, an "acquittal" includes "a ruling by the court that the evidence is insufficient to convict," a "factual finding [that] necessarily establish[es] the criminal defendant's lack of criminal culpability," and any other "rulin[g] which relate[s] to the ultimate question of guilt or innocence."  *Id.* at 319.  In contrast, "[p]rocedural dismissals include rulings on questions that are unrelated to factual guilt or innocence, but which serve other purposes, including a legal judgment that a defendant, although criminally culpable, may not be punished because of some problem like an error with the indictment."  *Id.*  Although federal

law determines whether a prosecution violates the Double Jeopardy Clause, the Supreme Court has looked to state law to determine whether a state court's decision constituted an acquittal. *Id.* at 320.

Notably, Delaware law requires the Superior Court to instruct juries on a lesser-included charge that has a "rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense." 11 Del. Code § 206(c). In turn, the double jeopardy analysis has been codified in 11 Del. Code § 207, which states, in part:

> There is an acquittal if the prosecution resulted in a finding of not guilty by the trier of fact or in a determination by the court that there was insufficient evidence to warrant a conviction. A finding of guilty of a lesser included offense is an acquittal of the greater inclusive offense, although the conviction is subsequently set aside.

11 Del. Code § 207(1).

Turning to the first prong of the § 2254(d)(1) inquiry, the Court notes that, while the Delaware Supreme Court did not cite to any U.S. Supreme Court precedent when affirming the Superior Court's denial of Petitioner's Rule 35 motion, the Delaware Supreme Court performed an inquiry consistent with the standard articulated in the aforementioned applicable federal law. *See Fahy v. Horn*, 516 F.3d 169, 196 (3d Cir. 2008) (finding Supreme Court of Pennsylvania's decision was not "contrary to" clearly established Federal law because it appropriately relied on its own state court cases, which articulated proper standard derived from Supreme Court precedent); *Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [U.S. Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."). Thus, the Delaware Supreme Court's decision was not contrary to clearly established federal law.

The Court must also determine if the Delaware Supreme Court reasonably applied U.S. Supreme Court precedent to the facts of Petitioner's case when denying the argument in Claim One.

12

The issue is whether the Delaware Supreme Court's ruling in Petitioner's direct appeal that the trial court erred by not including a lesser included offense instruction when it instructed the jury on attempted first degree robbery constituted an acquittal of the attempted first degree robbery conviction for double jeopardy purposes.  In its decision in Petitioner's Rule 35 appeal, the Delaware Supreme Court correctly noted that the Double Jeopardy clause bars retrial if the appellate court overturns a jury's guilty verdict on insufficiency of evidence grounds, articulated what constitutes an acquittal under 11 Del. Code § 207(1), and then opined that:

> This Court's finding in *Weber I* that there was "sufficient evidence to support an acquittal of the First Degree Robbery Charge" is not synonymous to a finding of insufficient evidence to support [Petitioner's] conviction. . . . [O]ur decision cannot be reasonably construed as a finding that the evidence was insufficient to support [Petitioner's] conviction because our inquiry was limited to whether the instruction was available as a matter of law, and if so, whether the evidence at trial supported a conviction on the lesser-included-offense.
>
> The court below correctly noted that our decision in *Weber I* "does not mean that [Petitioner] *should* have been acquitted but merely that a reasonable jury *could* have acquitted [Petitioner] on the robbery charge and they *should* have been allowed to consider the lesser included offense of Offensive Touching."  In *Weber I*, we expressly stated that if the jury did not find the victim's "testimony entirely credible, they *could* have concluded that the State failed to prove beyond a reasonable doubt that [Petitioner] attempted first degree robbery."  Because the trial court's determination is the only reasonable construction of our decision in *Weber I*, we find no merit to [Petitioner's] first claim.

*Weber*, 2015 WL 2329160, at *2.

The Court concludes that the Delaware Supreme Court's ruling in Petitioner's first direct appeal (*Weber I*) – that there was "sufficient evidence to support an acquittal of the First Degree Robbery Charge" and also sufficient evidence to convict on the offense of offensive touching – did not constitute an acquittal with respect to Petitioner's first degree robbery conviction.  Notably, neither the Superior Court's initial reason for not providing the lesser included offense, nor the

13

*Weber I* Court's reason for concluding that the lesser included offense should have been given,

constituted a ruling that the evidence was insufficient to convict Petitioner of first degree robbery.

For instance, when denying Petitioner's request for a lesser included offense instruction on offensive

touching, the Superior Court explained that it believed offensive touching did not constitute a lesser

included offense of first degree robbery under Delaware law "and that, in any event, there was no

rational basis to convict [Petitioner] on [o]ffensive [t]ouching." *Weber I*, 971 A.2d at 141. The

Superior Court's refusal to give the lesser included offense instruction was not based on an analysis

of the sufficiency of the evidence for first degree robbery. Relatedly, the *Weber I* Court's

determination that the trial court should have given a lesser included offense was not due to the

Delaware Supreme Court's determination that there was insufficient evidence to convict Petitioner

of first degree robbery. Rather, the *Weber I* Court's conclusion was based on its determination that

(a) Delaware law provided that offensive touching was a lesser included offense of first degree

robbery and (b) there was sufficient evidence to support a conviction of the lesser included offense.

The primary basis for the *Weber I* Court's conclusion was that, "[i]f the jury did not find the

[victim's] testimony entirely credible, they could have concluded that the State failed [to prove]

beyond a reasonable doubt that [Petitioner] attempted first degree robbery." *Weber I*, 971 A.2d at

142.

   Based on the foregoing analysis, the Court finds that the *Weber I* Court's ruling did not

adjudicate the ultimate question of Petitioner's factual guilt or innocence of first degree robbery and,

therefore, did not implicate the protections of the Double Jeopardy clause. Thus, Claim One does

not warrant habeas relief under § 2254(d).

### B. Claim Two: Prosecutorial Misconduct

In Claim Two, Petitioner contends that the State engaged in prosecutorial misconduct by calling the interaction between Petitioner and his victim a "struggle." Petitioner also argues that the prosecutor engaged in misconduct during rebuttal argument by expressing his opinion, vouching for Officer Hawk's identification of Petitioner, improperly shifting the burden of proof, and commenting on Petitioner's decision not to testify. Petitioner presented Claim Two to the Delaware Supreme Court on direct appeal, which summarily denied the Claim as meritless, without explanation. *See Weber*, 38 A.3d at 278. Nevertheless, the Delaware Supreme Court's decision constitutes an adjudication on the merits, and Petitioner will only be entitled to relief if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

In order for a prosecutorial misconduct claim to warrant federal habeas relief, the prosecutor's actions must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *see also Darden v. Wainwright*, 477 U.S. 168, 180 (1986). A prosecutorial misconduct claim must be examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). In the Third Circuit, this inquiry involves examining "the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95 (3d Cir. 2001). Simply alleging prosecutorial misconduct fails to establish a violation of due process, because the focus of the *Darden* inquiry is the unfairness of the trial, not the conduct of the prosecutor. *See Smith v. Phillips*, 455 U.S. 209, 219 (1982).

15

Petitioner contends that the State engaged in prosecutorial misconduct during closing argument in three ways. First, Petitioner asserts that the two prosecutors[2] improperly called the interaction between Petitioner and Naspo a struggle. That description, however, was appropriate given the evidence at trial. For instance, Naspo testified that he was at a gas station on August 18, 2004 preparing to refill his car when a man, later identified as Petitioner, approached him, stated he was going to take Naspo's car, told Naspo he had a gun, and then grabbed Naspo's left hand (in which Naspo held his car keys) with both hands. (D.I. 78-3 at 26-27) When asked if there was a struggle, Naspo responded "sort of." (*Id.*) The surveillance video memorializing the interaction – which Petitioner characterizes as "confirm[ing] being any doubt there was no struggle" – was played for the jury and the jurors were free to reach their own conclusion. (D.I. 1 at 48)

Given this record, the prosecutors' reference to the interaction as a "struggle" was an arguable but reasonable interpretation of the evidence, including the video that was admitted and played for the jury. Both sides were free to, and did, argue their interpretations during closing argument. Further, the Superior Court cured any harm caused by the prosecutors' characterization of the evidence by instructing the jury to rely on the evidence presented during the trial rather than the arguments of counsel. (D.I. 14, App. to Appellant's Op. Br. in *Weber v. State*, No. 23, 2011, at A107, A110)

The Third Circuit has consistently held that a "prosecutor is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence." *United States v. Lee*, 612 F.3d 170, 194 (3d Cir.2010). The prosecutors in this case did not misstate or manipulate the evidence; rather, their use of the term "struggle" was a permissible

---

[2]One prosecutor, Ms. Kate Keller, gave the closing argument and the other prosecutor, Mr. Stephen Walther, gave the rebuttal. (D.I. 14, App. to Appellant's Op. Br. in *Weber v. State*, No. 23, 2011, at A94-A97, A102-A107)

reference based upon the evidence introduced at trial.   Therefore, the prosecutor's use of the term "struggle" did not amount to prosecutorial misconduct.

Next, Petitioner contends that the prosecutor's use in rebuttal of the pronoun "I" when giving a hypothetical example to explain offensive touching as a lesser included offense comprised improper opinion and advocated the prosecutor's personal beliefs.  Petitioner also asserts that the prosecutor's use of the phrase "I don't know where defense counsel has been all this time," in rebutting defense counsel's statement that there was no evidence of an intent to commit robbery, improperly disparaged counsel.  When viewed in the context of the whole record, neither of these comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 180.

Third, Petitioner asserts that the prosecutor inappropriately vouched for Officer Hawk by stating, "There is no indication whatsoever that Officer Hawk had any ax to grind against" Petitioner.  (D.I. 1 at 58)  The prosecutor made this statement when he compared the potential bias of Officer Hawk, who identified Petitioner, to that of Petitioner's child's mother, who testified that the man in the crime scene video was not Petitioner.  (D.I. 14, App. to Appellant's Op. Br. in *Weber v. State*, No. 23, 2011, at A107)

A prosecutor cannot bolster his case by vouching for the credibility of a witness.  *See United States v. Dispoz-O-Plastics, Inc.*, 172 F.3d 275, 283 (3d 1999).  A prosecutor's statements constitute vouching when two criteria are met:

> (1) the prosecutor must assure the jury that the testimony of a Government witness is credible; and (2) this assurance is based on either the prosecutor's personal knowledge, or other information not contained in the record.  Thus, it is not enough for a defendant on appeal to assert that the prosecutor assured the jury that a witness' testimony was credible.  The defendant must be able to identify as the basis for [the prosecutor's comment on witness credibility] explicit or

17

implicit reference to either the personal knowledge of the prosecuting attorney or information not contained in the record.

*United States v. Walker*, 155 F.3d 180, 187 (1998).  Contrary to Petitioner's contention, the prosecutor's act of pointing out differentials in sources of bias, drawn from information in the trial record, did not amount to improper vouching.

Petitioner himself raised the issue of Officer Hawk's alleged bias and compared Hawk's testimony with the testimony of the mother of Petitioner's child, stating:

> When Michelle Workman testified I can't identify this person, it is not a good quality, I can't see this picture, it's true, you can't.  And the police officer who said he recognized [Petitioner] is the same police officer who believes that T-shirt in that arrest thing is blue and not gray.  You can't rely on his testimony.  He is bias[ed].  He is a police officer.  That's basically he didn't want to be bothered taking statements or doing his work or doing his investigation.  It was easier to say it's [Petitioner], looks like him, good enough for me.

(D.I. 14, App. to Appellant's Op. Br. in *Weber v. State*, No. 23, 2011, at A101-102)  The prosecutor responded:

> The defense relies upon Michelle Workman to convince you based upon her testimony and her looking at the crime scene video that that is not [Petitioner].  Well, Ladies and Gentlemen, to compare the bias of the woman to Officer Hawk simply is not supported by the evidence in this case.  There is no indication whatsoever that Officer Hawk had any ax to grind against [Petitioner].  The only evidence is that he knew him and that he had known him for years and he had seen him several times before August 18th 2004 just doing his job.
>
> Michelle Workman, [Petitioner] is the father of her child.  The bias is inherent.  Of course she is going to come in here to help him.

(*Id.* at 104)  The prosecutor's statement that Officer Hawk did not "have an ax to grind" was a permissible reference based upon the evidence produced at trial in an effort to counter defense counsel's remarks denigrating Hawk.

Even if the prosecutor's "ax to grind" statement constituted vouching, it does not warrant granting Petitioner habeas relief. "Vouching aimed at the witness's credibility and . . . based on extra-record evidence is deemed non-constitutional error." *United States v. Vitillo*, 490 F.3d 314, 329 (3d Cir. 2007). In turn, "non-constitutional error is harmless where it is highly probable that the error did not contribute to the judgment and the court has a sure conviction that the error did not prejudice the defendant." *Id.* A court determines prejudice by examining the "scope of the comments and their relationship to the proceeding, the extent of any curative instructions, and the strength of the evidence against the defendant." *Id.* Here, the prosecutor only made the no "ax to grind" statement once, just before describing the evidence supporting Hawk's knowledge of Petitioner, and he did not express it in the form of a personal opinion. The trial court instructed the jurors that their decisions must be based on the evidence seen and heard in the courtroom, and that the statements and arguments made by the attorneys did not constitute evidence to be weighed in reaching a decision. Thus, even if the prosecutor's statement constituted vouching, the error was harmless and did not contribute to Petitioner's conviction. Accordingly, Petitioner was not prejudiced by the prosecutor's remark.

Finally, Petitioner contends that, during his rebuttal argument, the prosecutor improperly shifted the burden of proof and improperly commented on Petitioner's failure to testify. To understand this contention, it is first necessary to excerpt the following portion of defense counsel's closing argument:

> Did you hear any evidence from anybody what [Petitioner] was —
> whether he was wearing jewelry on that night? Did anybody say that?
> If he was and he had an earring, does this individual in this picture have
> an earring?

19

And if you looked at this picture of the individual, on the back of his neck there is a chain. Is this a tattoo? Does [Petitioner] have any tattoos? Did they tell you? No.

If this individual has a tattoo and [Petitioner] doesn't, is this him? No. If this individual doesn't have a goat-tee [sic] and [Petitioner] does, is that him? No. And this person says this person has a goat-tee. You can look at it. At times there is some shading, at times there's not. You can't tell. The quality of this picture is not of that value, but yet they want you to convict someone of attempted robbery first degree, a felony, based on that.

On this picture state exhibit seven, look at his hand. There appears to be something on his wrist. Whether that is a mark, whether that's a scar, whether that's a watch, we don't know. They don't know. Wouldn't you think you would want evidence if you saw somebody 45 minutes later that he had the same things on his hands and if he doesn't is it him? No. Do you know? No. Do you have any pictures of his body? No. Do you have any testimony from somebody? There is all these cops there, county cops, K-9 cops. Does anybody else come in to say oh, yeah, this is what I saw? No.

(D.I. 14, App. to Appellant's Op. Br. in *Weber v. State*, No. 23, 2011, at A98-99)  In rebuttal to

Petitioner's argument, the prosecutor stated the following:

Defense counsel suggests that in what he has referred to as a grainy, hard to see crime scene video that there's an earring. You look at it. Okay. If you see there is an earring, fine, there is an earring. But what he's suggesting is that the State should have seen [if] there was an earring in there and they should have offered some evidence at some point, perhaps on August 19th when he was arrested, that he had an earring.

They also [raise] a straw argument well about tattoos, marks on his arms, those kinds of things. Well, again, you look at the crime scene photo. Is there any indication that he has any scars? Is there any indication that he has any tattoos? No. If in fact he had some major giant tattoo on his arm and you could clearly see his arms, don't you think the defense would say look, this man in the crime scene video has no tattoos, look at my client he's got a big tattoo that should be up there? That wasn't the evidence. He throws it back on the State to prove something that is not even an element of the offense.

(*Id.* at A105)

20

The prosecutor's remarks were fair rebuttal to defense counsel's comments and were based on the trial record as a whole. They did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 180.

For the foregoing reasons, the Court concludes that the Delaware Supreme Court's rejection of all the arguments in Claim Two was neither contrary to, nor an unreasonable application of, *Darden*.

### C. Claim Three: Judicial Encroachment During *Voir Dire*

In Claim Three, Petitioner contends that the Superior Court's improper, prejudicial, and insufficient *voir dire* interfered with the presentation of his defense. (D.I. 1 at 63) Petitioner asserts that the State "incorrectly represented to the trial court that . . . Petitioner intended to present an insanity defense," and "requested two highly prejudicial *voir dire* questions concerning drug use and mental illness." (D.I. 1 at 24) He further alleges that, despite his immediate objection that he did not intend to present any insanity defense, the Superior Court improperly asked the prospective jury panel the two questions pertaining to mental illness and illicit drug use. (D.I. 1 at 64) He states that, as a result, the

> *voir dire* was prejudicial and inflammatory and suggested Petitioner was mentally ill and a drug user. The improper *voir dire* created such unrealized expectations and exposed the jury to the highly prejudicial and inflammatory stigma of mental illness and drug use as to infect the entire proceeding with unfairness and a denial of due process. Exacerbating this error yet further, the trial court improperly persuaded Petitioner to abandon his intended defense, which would have negated the prejudicial effect of the *voir dire*.

(D.I. 1 at 64) According to Petitioner, he never indicated to the State that: (1) "he might present evidence he was not criminally responsible due to mental defect;" (2) "he might suffer from mental defect;" (3) "he might have a long history of drug abuse;" or (4) "he intended to pursue a guilty but

21

mentally ill defense or any other defense based on mental illness." (D.I. 105 at 17-18)  He also

asserts that he "never proffered an expert opinion that he was suffering mental illness." (D.I. 105 at

18)  Instead, Petitioner intended to present a "nuanced defense on the elements" that his behavior

on the night of the offense was due to adverse effects from prescription medication. (D.I. 1 at 64-

65)  According to Petitioner, this "defense of renunciation . . . negated any culpability even if it was

determined there was sufficient evidence to support *mens rea* and *actus reus*." (D.I. 1 at 65)

     In *Weber II*, the Delaware Supreme Court summarily denied the arguments in Claim Three as

meritless.  Therefore, Claim Three will only warrant relief if the Delaware Supreme Court's decision

was either contrary to, or an unreasonable application of, clearly established federal law.

     Pursuant to well-settled U.S. Supreme Court precedent, a trial court is granted wide

discretion in determining the scope and manner of *voir dire*, including which questions will be asked

and whether individual questioning will be permitted.  *See Mu'Min v. Virginia*, 500 U.S. 415, 427

(1991); *Ham v. South Carolina*, 409 U.S. 524, 528 (1973); *Aldridge v. United States*, 283 U.S. 308, 310

(1931).  Nevertheless, "the exercise of the trial court's discretion, and the restriction upon inquiries

at the request of counsel, are subject to the essential demands of fairness." *Morgan v. Illinois*, 504 U.S.

719, 730 (1992).  In *Connors v. United States*, 158 U.S. 408, 413 (1895), the Supreme Court stated:

> [A] suitable inquiry is permissible in order to ascertain whether the
> juror has any bias, opinion, or prejudice that would affect or control
> the fair determination by him of the issues to be tried.  That inquiry is
> conducted under the supervision of the court, and a great deal must,
> of necessity, be left to its sound discretion.  This is the rule in civil
> cases, and the same rule must be applied in criminal cases.

     The manner in which the Superior Court conducted *voir dire* in Petitioner's case did not

render his trial unfair.  Contrary to his assertion, the record demonstrates that Petitioner did indicate

to both the State and the Superior Court that he was contemplating the possibility of presenting

some type of defense related to his mental condition.  For instance, the Superior Court docket

contains an entry dated January 13, 2010, approximately four months before trial was scheduled to

begin, stating:

> The Court has received copies of the reports of Dr. Donahue and Mr.
> Richmond provided by Mr. Ramunno which were also forwarded to
> the State on January 8, 2010.  Obviously the Court needs to give the
> State some time to digest the reports and, if necessary, obtain a rebuttal
> expert.  As such, the deadline for the State's reports, if any, to be
> provided to Mr. Ramunno, will be February 26, 2010.

(D.I. 14, Super. Ct. Crim. Dkt. as of 9/30/2013, at Entry No. 129)  At the beginning of *voir dire*, the

State informed the Superior Court that it had "some proposed jury instructions, *voir dire*

instructions," "given the fact that [the State] ha[d] received from defense counsel notice that there

would be an insanity defense."  (D.I. 2 at 3)  The Superior Court asked defense counsel if he had any

objection, and defense counsel replied "yes."  (*Id.*)  Defense counsel then explained,

> because I think there may or may not be testimony.  Because at this
> point in time it's their case.  There is notice.  But we haven't presented
> any expert testimony and may not present any expert testimony.
> [Petitioner's] position is that he does not intend on raising an insanity
> defense, if you will, basically because of the circumstances of the case
> and the medication he was on.  It is his position that his defense would
> be an involuntary in[toxication] – it goes to the state of mind as far as
> the intentional act, but he does not intend to present a mental illness
> as we know the traditional one.

(*Id.*)  The State responded that the expert opinion proffered by defense counsel suggested that

Petitioner was suffering from a mental illness which substantially affected his ability to understand

the wrongfulness of his acts and that Petitioner was guilty but mentally ill.  (D.I. 2 at 4)  The expert

opinion also recounted Petitioner's long history of alcohol, cocaine, and methamphetamine abuse.

(*Id.*)

23

In light of the expert's opinion proffered by defense counsel, the State asked the Superior

Court to inquire of the venire whether they had any predispositions about either mental illness or

illegal drug use. The Superior Court decided to ask the questions requested by the State, ruling that:

> I think both questions are appropriate to ensure not only from the
> State's point but I think from the defense point of view. If the
> circumstances were that the trial proceeds perhaps not in the way the
> defendant believes it may flow but if [defense counsel] feels to
> appropriately defend the action he has introduced a defense about
> mental illness or drug use that would affect his mental state, there are
> questions that need to be asked to a jury to ensure we don't have
> someone who may have an adverse reaction to them which would be
> adverse to [Petitioner] not just to the State, so I think both questions
> are appropriate and will be asked of the jury panel.

(D.I. 2 at 4) Consequently, the Superior Court asked two questions: "has any member of the panel,

a close friend or relative, ever been diagnosed with a mental disorder or psychiatric disorder?" and

"there may be, and I emphasize may be, testimony in the trial regarding the unlawful use of

drugs. If such evidence was presented, would it affect your ability to render a fair and impartial

verdict based solely on the evidence presented?" (D.I. 2 at 6)

As an initial matter, the Court concludes that the trial court's determination that it should

present the State's proposed questions to the potential jurors was reasonable because: (1) defense

counsel proffered the expert opinion raising the issue of Petitioner's mental illness due to prior drug

use; and (2) defense counsel  indicated he was considering presenting a non-traditional mental illness

defense of intoxication. The two questions proposed by the State were relevant to determining if

any potential juror harbored any bias against the mentally ill or users of illegal drugs. In turn, the

questions were designed to eliminate bias against Petitioner's potential defense and were also crafted

so as not to indicate that each was directed at Petitioner. Thus, the Court concludes that the two

questions concerning mental illness and prior drug use that the trial court asked during *voir dire* did not violate Petitioner's right to an impartial jury and fair trial.

At the close of the State's case, and upon the Superior Court's denial of Petitioner's motion for dismissal based on insufficient evidence, the Superior Court engaged Petitioner and defense counsel regarding whether Petitioner would call witnesses to pursue a theory that Petitioner was not the person who committed the crimes, or whether Petitioner would call witnesses (including an expert and Petitioner himself) to pursue a theory that while Petitioner committed the crimes, he was not responsible for those crimes due to his mental condition. (D.I. 2-1 at 19-21) Petitioner complains that the Superior Court's discussion improperly intruded into his defense strategy and infringed on his right to consult with counsel, but at the same time was "woefully insufficient" regarding Petitioner's decision as to whether or not to testify.

The record suggests that Petitioner's own case management necessitated the Superior Court's inquiry. As previously discussed, before trial commenced, Petitioner indicated he had not yet decided whether to present his mental condition defense. (D.I. 2 at 3-4) At that time, both parties indicated that, should Petitioner elect to call the expert, it may create scheduling difficulties. (*Id.*) It was therefore necessary and appropriate for the trial court to evaluate, before the beginning of the defense case, which witnesses the defense would ultimately call. The trial court's comments regarding the logical inconsistencies between the two theories did not, as Petitioner claims, dissuade him from pursuing the mental state defense; the trial court only pointed out the difficulties in pursuing both defenses at the same time. (D.I. 2-1 at 19) Defense counsel said he recommended that Petitioner not pursue the mental state defense, while the prosecutor pointed out the risk of exposing Petitioner's criminal record if he chose to testify. (*Id.* at 19-20) The trial court twice excused Petitioner and defense counsel so that they could confer, and repeatedly encouraged

25

Petitioner to make the choice with defense counsel; Petitioner ultimately made the choice to pursue the first theory of identification. (*Id.*) This record belies Petitioner's contention that the trial court interfered with his choice as to which defense theory to pursue. Therefore, the Court will deny this portion of Claim Three as factually baseless.

Petitioner's second argument, that the colloquy as to whether he would take the stand was insufficient to advise him of his right to testify or not, is similarly unavailing. A court "has no duty to explain to the defendant that he or she has a right to testify or to verify that the defendant who is not testifying has waived that right voluntarily." *United States v. Pennycooke*, 65 F.3d 9, 11 (3d Cir. 1995). As noted, the discussion as to which theory Petitioner would pursue included a discussion of the risks of taking the stand. (D.I. 2-1 at 20) After Petitioner decided to pursue the identification defense, the trial court confirmed that Petitioner had had an opportunity to talk with defense counsel before making the "individual decision" not to testify. (*Id.* at 21) Petitioner stated that he had discussed the decision with defense counsel and that he had decided not to testify. (*Id.*) The trial court did not have a duty to do anything further to protect Petitioner's constitutional rights. *See United States v. Gordon*, 290 F.3d 539, 546 (3d Cir. 2002). Thus, the Delaware Supreme Court's decision denying Petitioner relief on this issue was neither contrary to, nor an unreasonable application of, clearly established federal law.

### D. Claim Four: Privation of Jury Lenity

Next, Petitioner contends that he was denied the right to "jury lenity" because the jury on retrial – which considered the attempted first degree robbery charge – did not know he had already been convicted of carjacking. He argues that Delaware recently enacted legislation "to abolish the offense of carjacking in toto and merge the offense with robbery," revealing "it was never the intent to impose dual punishments for the two offenses." (D.I. 105 at 24)

Petitioner presented this argument to the Delaware Supreme Court in support of his double jeopardy argument. The Court discusses the double jeopardy implications of Claim Four in its analysis of Claim Eight. *See infra* at Section IV.G. To the extent Claim Four asserts an independent argument, it does not warrant relief.

Petitioner cites the following portion of *United States v. Powell*, 469 U.S. 57, 64-66 (1984), as support for his argument:

> A verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show they were not convinced of the defendant's guilt.

> \*          \*          \*

> [Jury lenity] is recognition of the jury's historic function, in criminal trials, as a check against arbitrary or oppressive exercises of power by the executive branch.

*Powell* explains that jury lenity is one of several potential explanations for an inconsistent verdict that underlies the rule against a defendant attacking a conviction because it is inconsistent with an acquittal. *See id.* at 61-67. Yet, there is no independent constitutional right to "jury lenity," and a claim alleging inconsistent verdicts does not provide a basis for habeas relief. *See id.* at 63. Thus, the fact that the jurors evaluating Petitioner's attempted robbery charge were unaware of his conviction for carjacking does not aid in Petitioner's request for habeas relief.

### E. Claim Five: Insufficient Evidence

In Claim Five, Petitioner asserts there was insufficient evidence to allow the jury to convict him of attempted first degree robbery. (D.I. 1 at 88) The Delaware Supreme Court summarily denied Claim Five as meritless in *Weber II*. Thus, the Court must review Claim Five under § 2254(d) to determine if Petitioner is entitled to habeas relief.

The United States Supreme Court precedent governing insufficient evidence claims is *Jackson v. Virginia*, 443 U.S. 307 (1979).  Pursuant to *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319.  This standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16.  Additionally, "a federal habeas court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.  It is not necessary that the evidence exclude every reasonable hypothesis except that of guilt.  *See id.*

Here, Petitioner generally contends that the State failed to prove the elements of attempt, substantial step, specific intent, threat of force, and permanent deprivation.  (D.I. 1 at 88)  His argument is unavailing.

In order for Petitioner to be convicted of attempted first degree robbery, the State had to prove the following elements beyond a reasonable doubt: (1) Petitioner's conduct occurred in the course of attempting to commit a theft; (2) Petitioner must have threatened the immediate use of force on Mr. Naspo; (3) Petitioner must have acted with the intent to compel the owner of the property or another person to deliver up the property; (4) Petitioner either represented by word or conduct that he was in possession of a deadly weapon, in this case a gun, and/or the victim was 62 years of age or older; and (5) Petitioner's conduct was intentional, voluntary and – under the circumstances as he believed them to be – was a substantial step in a course of conduct planned to culminate in his commission of the crime of first degree robbery.  (D.I. 14, App. to Appellant's Op. Br. in *Weber v. State*, No. 23, 2011, at A108)

28

On Weber's motion for acquittal, the Superior Court found Petitioner "said I want your car and I have a gun and there is a skirmish that occurs, and so to the Court there appears to be no question that there is an attempted robbery that is occurring here." (D.I. 2-1 at 19)  Naspo testified that Petitioner said, "I'm going to take your car," while grabbing Naspo's hands to try to get Naspo's keys.  (D.I. 2 at 21)  The video surveillance showed a struggle between Naspo and Petitioner. *See Weber I*, 971 A.2d at 142.  Viewing the video and Naspo's testimony in the light most favorable to the State, the Court concludes that a rational trier of fact could have found Petitioner committed a substantial step in a course of conduct planned to culminate in overcoming Naspo's resistance to Petitioner taking his car. *See* 11 Del. Code §§ 531(2), 532, 832.

As for the threat and/or use of force element, the video showed a struggle that caused Naspo offense and alarm, and caused him to fall against the door of his car.  Naspo testified that Petitioner grabbed Naspo's hands with both of his hands trying to get his keys, and that Petitioner twice told him he had a gun.  (D.I. 2 at 21,  28)  In Petitioner's first direct appeal, the Delaware Supreme Court found that the video evidence alone was sufficient to at least prove offensive touching. *See Weber I*, 971 A.2d at 142.  Then, when denying Petitioner's motion for reargument with respect to Petitioner's second appeal, the Delaware Supreme Court concluded that Naspo's testimony, combined with the video, was sufficient to support the jury's finding of actual or threatened use of force.  (D.I. 2-3 at 20-21)

After viewing the evidence of the struggle over the keys and Petitioner's threat of a gun in the light most favorable to the State, the Court concludes a rational trier of fact could have concluded that Petitioner both used and threatened force in attempting to rob Naspo, and that Petitioner represented by word that he was in possession of a deadly weapon. *See* 11 Del. Code §§ 831(a), 832(a)(2).

29

As for the elements of intent and permanent deprivation, Petitioner's statement "I'm going to take your car" shows Petitioner's intent to permanently deprive Naspo of his car.  (D.I. 2 at 21) Viewing Petitioner's statement and actions in the light most favorable to the State, a rational trier of fact could have found Petitioner intended to permanently deprive Naspo of his car.

Based on the foregoing, the Court concludes that the Delaware Supreme Court's denial of Petitioner's claim that there was insufficient evidence to support his conviction was not contrary to, or an unreasonable application of, *Jackson*.  Therefore, the Court will deny Claim Five.

## F.   Claims Six and Seven: Insufficient Instruction on the Elements and Defenses

In Claim Six, Petitioner contends that the Superior Court provided an insufficient instruction on the elements of the attempted first degree robbery offense because the instruction did not include the statutory definitions of the elements.  In Claim Seven, Petitioner asserts that the Superior Court should have instructed the jury on the defense theories of renunciation and legal impossibility.  Petitioner presented these Claims to the Delaware Supreme Court on direct appeal after his retrial (*i.e., Weber II*), and then again in his motion for reargument from the Delaware Supreme Court's decision in *Weber II*.  When denying Petitioner's motion for reargument, the Delaware Supreme Court denied both Claims as waived under Delaware Supreme Court Rule 8 and also as affirmatively waived.  (*See* D.I. 14, *Weber v. State*, No.23,2011 Order, at 4-5 (Del. Mar. 20, 2012))  Specifically,  the Delaware Supreme Court held:

> After reading the above instructions, the trial judge asked counsel, "Any objections to the instructions read?"  Counsel for [Petitioner] replied, "No, Your Honor."
>
> [Petitioner] assigns error to jury instructions that were either not requested, or to which he never objected, and thus his claims are considered waived under Supreme Court Rule 8.  Moreover, in his brief, [Petitioner] provided no explanation as to why the unpreserved error is plain.

> Not only did Petitioner fail to preserve error by not objecting to any
> of the jury instructions, [Petitioner] affirmatively waived his claims.

*Id.*

By applying the procedural bar of Rule 8, the Delaware Supreme Court articulated a "plain statement" under *Harris v. Reed*, 489 U.S. 255, 263-64 (1989), that its decision rested on state law grounds.  This Court has consistently held that Delaware Supreme Court Rule 8 is an independent and adequate state procedural rule precluding federal habeas review absent a showing of cause for the default, and prejudice resulting therefrom, or a showing that a miscarriage of justice will occur if the claim is not reviewed.  *See Campbell v. Burns*, 515 F.3d 172, 182 (3d Cir. 2008).

Petitioner has not provided any cause for his default of Claims Six and Seven.[3]  In the absence of cause, the Court will not address the issue of prejudice.  Additionally, the miscarriage of justice exception to the procedural default doctrine is inapplicable because Petitioner has not provided any new reliable evidence of his actual innocence.  Accordingly, the Court will deny Claims Six and Seven as procedurally barred.

### G.  Claim Eight: Carjacking and Robbery Convictions Violate Double Jeopardy

Petitioner argues that his convictions for attempted first degree robbery and attempted first degree carjacking merged for sentencing purposes, thereby rendering the imposition of cumulative punishments for both convictions a violation of the Double Jeopardy Clause.  More specifically, Petitioner argues:

> [Petitioner] actually served the sentence imposed for the carjacking
> offense and was released from prison.  [Petitioner] later returned to
> prison to serve another sentence for identical conduct under a statute
> with the identical elements [*i.e.*, the robbery statute].

---

[3]Petitioner's argument concerning the difference between forfeiture and waiver is not an argument to establish cause but, rather, an argument as to why the Delaware state courts erroneously view the Claims as waived.

(D.I. 105 at 81)  The Delaware Supreme Court summarily denied this argument in Petitioner's direct appeal after his conviction on retrial.  *See Weber II*, 38 A.3d at 278.  Thus, Claim Eight will only warrant relief if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

The Double Jeopardy Clause protects against multiple punishments for the same offense. *See North Carolina v. Pearce*, 395 U.S. 711, 717 (1969).  In *Brown v. Ohio*, 432 U.S. 161, 164-65 (1977), the Supreme Court explained that the protections of the Double Jeopardy Clause also protect against a second prosecution for the same offense after conviction.  *Id.*  The traditional test for determining if two offenses under separate statutes are sufficiently distinguishable to permit the imposition of cumulative punishments is the same-elements test set forth in *Blockburger v. United States*, 284 U.S. 299 (1932).  Pursuant to *Blockburger*, a court must analyze "whether each offense contains an element not contained in the other; if not, they are the 'same offense' and double jeopardy bars additional punishment and successive prosecution."  *United States v. Dixon*, 509 U.S. 688, 696 (1993).  The rule articulated in *Blockburger*, however, is a "rule of statutory construction to help determine legislative intent;" it is "not controlling when the legislative intent is clear from the face of the statute or the legislative history."  *Garrett v. United* States, 471 U.S. 773, 778-79 (1985). Consequently, "even if the crimes are the same under *Blockburger*, if it is evident that a state legislature intended to authorize cumulative punishments, a court's inquiry is at an end."  *Ohio v. Johnson*, 467 U.S. 493, 499 n.8 (1984).  As the Supreme Court held in *Missouri v.* Hunter, 459 U.S. 359, 368-69 (1983):

> [S]imply because two criminal statutes may be construed to proscribe
> the same conduct under the *Blockburger* test does not mean that the

> Double Jeopardy Clause precludes the imposition, in a single trial, of cumulative punishments pursuant to those statutes. . . .
>
> Where . . . a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct under *Blockburger*, a court's task of statutory construction is at an end, and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.

At the time of Petitioner's conviction, Delaware's carjacking statute explicitly stated that "This section is not a related or included offense of § 831 [second degree robbery] or § 832 [first degree robbery] of this title. Nothing in this statute shall be deemed to preclude prosecution under any other provision of this Code." 11 Del. Code § 835(f) (2003). In 2019, the Delaware General Assembly repealed the carjacking statute,[4] and Petitioner argues that the repeal was done in "recognition that it was never the intent to impose punishments for both carjacking and robbery."[5] (D.I. 105 at 81; D.I. 119 at 2; D.I. 124; D.I. 125 at 1 n.3) Petitioner's argument is unpersuasive. Presumably, if the legislature truly *never* intended to impose punishments for both offenses, the Delaware General Assembly would have expressly made the repeal retroactively applicable. Yet, as the Delaware Superior Court explained in its most recent decision denying Petitioner's instant argument, the Delaware General Assembly did not expressly make the repeal of the carjacking statute retroactively applicable, and well-established Delaware law precludes finding that that the repeal of the carjacking statute is implicitly retroactive. *See State v. Weber*, 2022 WL 2112949, at *4 (Del. Super. Ct. June 8, 2022); D.I. 125-1 at 9-11) Thus, given the General Assembly's clear intent at

---

[4] *See* 82 Del. Laws, c. 216, § 1, eff. Sept. 16, 2019.

[5] During the pendency of this proceeding, Petitioner filed a Motion to Bifurcate and/or Obtain a Summary Judgment on Claim Eight. (D.I. 119) The Court denied the Motion on March 31, 2022, but informed Petitioner that it would consider the argument in Claim Eight presented in that Motion when it considered his Petition as a whole. (*See* D.I. 122) The instant discussion of Claim Eight includes the argument presented in the Motion to Bifurcate/Obtain Summary Judgment..

the time of Petitioner's conviction to authorize cumulative punishments for first degree robbery and

carjacking, the Delaware Supreme Court's denial of Claim Eight was neither contrary to, nor an

unreasonable application of, clearly established federal law.  Accordingly, the Court will deny Claim

Eight for failing to satisfy § 2254(d).

### H.  Claim Nine: Plea Bargain Process Violated Due Process

In Claim Nine, Petitioner contends that the State's withdrawal of the original plea offer

deprived him of due process and a fair trial, and constituted selective prosecution.[6]  The Superior

Court denied these arguments as meritless when it denied Petitioner's motion to enforce the plea

agreement, and the Delaware Supreme Court summarily affirmed that decision.  *See State v. Weber*,

2010 WL 5343153, at *1 (Del. Super. Ct. Dec. 15, 2010); *Weber II*, 38 A.3d at 278.  Given these

circumstances, Claim Nine will only warrant relief if the Superior Court's decision was either

contrary to, or an unreasonable application of, clearly established federal law.  *See Wilson v. Sellers*,

138 S. Ct. 1188, 1193-94 (2018) (reiterating that when higher court affirms lower court's judgment

without opinion or other explanation, federal habeas law employs "look through" presumption and

assumes that later unexplained order upholding lower court's reasoned judgment rests upon same

grounds as lower court judgment).

"[T]here is no federal constitutional right to plea bargain; the prosecutor need not do so if he

prefers to go to trial."  *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977).  The State may withdraw a plea

offer at any time before it is accepted or detrimentally relied upon.  *See Government of Virgin Islands v.

Scotland*, 614 F.2d 360 (1980) (generally, until or unless defendant actually accepts plea deal,

government can always withdraw its plea offer, and defendant cannot compel reinstatement of

---

[6]To the extent Petitioner presents Claim Nine as a breach of contract claim, it constitutes a non-cognizable state law claim.  *See, e.g., Fortenberry v. Sternes*, 2003 WL 21939558, at *2 (N.D. Ill. Aug. 13, 2003).

withdrawn plea deal since he has no right to compel specific performance unless or until he has relied on deal to his detriment).

The Superior Court explained its reasons for denying Petitioner's motion to enforce the plea offer as follows:

> [Petitioner] seeks to enforce the original plea offer made to him by the State. This plea agreement would have required [Petitioner] to plead guilty to Attempted Robbery Second and the State would recommend a sentence of five years at level five. In response, [Petitioner] requested the State to agree that he was entitled to credit time of approximately two years. The State refused to agree, and the original offer was rejected. A few days later, in response to defendant's credit time request, the State modified its offer and agreed that [Petitioner] could receive the credit time but in doing so would increase its Level 5 recommendation to seven years. This would ensure [Petitioner] would serve the five years the State was seeking. [Petitioner] rejected the modified offer and the case proceeded to trial.
>
> The Court will not enforce the original plea offer made by the State. First, as a general matter, a defendant has no legal entitlement to a plea bargain. Thus, the State has no obligation to provide him with one. A plea agreement is undertaken for mutual advantage and governed by contract principles. Acceptance of an offer is required for the formation of an enforceable contract. A defendant's rejection of the State's offer ordinarily terminates the defendant's right to accept the offer. A defendant has "no right to require the prosecutor to re-offer a plea which was rejected by the defendant."
>
> Nothing in this case suggests that [Petitioner] and the State ever reached an actual agreement with respect to the terms of [Petitioner's] plea. It appears that the State originally offered a plea that included a recommendation of five years, but [Petitioner] would only accept the offer if the State agreed that he was entitled to two years of credit time. The State rejected this proposal but modified its offer with a seven year recommendation with no objection to the credit time. [Petitioner] rejected this offer and the case proceeded to trial. [Petitioner] now claims that he would have accepted the State's offer of five years at level five and that the State unfairly revised its offer to seven years because of the application of credit time. However, there is no evidence in the record to suggest that there was a "meeting of the minds" sufficient to establish an enforceable contract. Accordingly,

35

> [Petitioner] cannot show that he has a contractual right to the
> enforcement of the State's plea offer.

*Weber*, 2010 WL 5343153, at *1.

Petitioner contends the Superior Court erred in its factual findings surrounding the plea negotiations, specifically, that Petitioner did not in fact respond to the prosecutor's original plea offer by "request[ing]" time served, and Petitioner did not in fact "reject" this original offer when it did not contain that allowance. Petitioner claims he assumed the original offer included time served, and he stated his intent to accept that offer, but then the prosecutor changed the plea offer. (D.I. 1-2 at 11-12) According to Petitioner's version of the facts, there was a "meeting of the minds" and therefore an enforceable plea agreement, and he detrimentally relied on the plea offer by not preparing for trial. (*Id.*)

Petitioner has not provided any evidence to support his version of the facts, much less the clear and convincing evidence required by 28 U.S.C. § 2254(e)(1). Consequently, the Court concludes that the Superior Court reasonably determined the facts in light of the evidence presented when it determined that Petitioner and the prosecutors did not reach an agreement with respect to the terms of Petitioner's plea.

As part of his argument, Petitioner asserts that the State made a pretrial comment that he had "gotten away" with a criminal offense in the past. To the extent Petitioner is attempting to demonstrate that the State vindictively withdrew the plea offer, the attempt is unavailing. In *Bordenkircher v. Hayes*, 434 U.S. 357, 362-63 (1978), the Supreme Court held that a prosecutor's threat made during plea bargaining, based on the prosecutor's knowledge of defendant's prior felony convictions, did not violate due process, and explained this was distinct from vindictive reindictment or sentencing because, "[i]n the 'give-and-take' of plea bargaining, there is no [constitutionally

impermissible] element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer." Here, the State's alleged pretrial comment did not impede Petitioner from accepting or rejecting the prosecution's offer and, therefore, did not violate Petitioner's constitutional rights.

Based on the foregoing, the Court concludes that the Superior Court's refusal to grant Petitioner's motion to enforce the State's original plea offer was neither contrary to, nor an unreasonable application of, *Weatherford* or *Bordenkircher*. Therefore, the Court will deny Claim Nine.

### I.  Claim Ten: Insufficient Evidence of Identification

In Claim Ten, Petitioner contends that there was insufficient evidence to support his identification and that the circumstances of his out-of-court identification violated his due process rights. Petitioner also asserts that Officer Hawk's testimony warranted *voir dire* on whether individual prospective jurors would give more weight to a police officer's testimony than they would give to the testimony provided by other witnesses. (D.I. 1-2 at 42) The Delaware Supreme Court summarily denied the first two arguments in Claim Ten as meritless in *Weber II*. Although the Court cannot discern if the Delaware Supreme Court addressed Petitioner's argument regarding the trial court's failure to question the potential jurors' ability to impartially evaluate a police officer's credibility, the State treats the argument as though it was considered by the Delaware Superior Court in *Weber II*. (D.I. 12 at 27-28) In these circumstances, all three arguments in Claim Ten will only warrant habeas relief if the Delaware Supreme Court's decision was contrary to, or constituted an unreasonable application of, clearly established federal law.

#### 1.  Insufficient evidence of identification

As previously discussed, the clearly established federal law governing insufficient evidence claims is the standard articulated in *Jackson v. Virginia*, 443 U.S. at 319. "[T]he relevant question is

37

whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier

of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

The State presented the same identification evidence in Petitioner's first trial and then again

in his retrial.  The Delaware Supreme Court twice found that evidence to be sufficient:

> [T]he State presented sufficient evidence that Weber was the person
> seen in the surveillance video accosting Naspo.  Although Naspo did
> not positively identify [Petitioner] as his assailant, Hawk independently
> identified [Petitioner] as the person shown on the surveillance video.
> Naspo was seventy four years old at the time of the incident, which
> occurred at approximately 10 p.m.  Naspo's contact with [Petitioner]
> lasted only a few seconds.  Hawk, however, testified that he had known
> [Petitioner] since 1985.  Moreover, the jury watched the surveillance
> tape at trial, thus enabling the jurors to make their own determination.
> In addition to observing [Petitioner] during the trial, the jury also
> viewed pictures of [Petitioner] taken at the time of his arrest.

> \*               \*               \*

> Hawk identified [Petitioner] based on two factors: his review of the
> surveillance video and his familiarity with [Petitioner's] appearance.
> Not only had Hawk known [Petitioner] since 1985 but also he saw
> [Petitioner] on the day of the incident.  The jurors did not know how
> [Petitioner] looked on the day of the incident.  They only knew how
> [Petitioner] looked at the time of his arrest (from pictures taken at the
> police station,) and how he looked during the trial (through direct
> observation).

> \*               \*               \*

> The jury also heard other evidence concerning identification.  Naspo
> originally described his assailant as []a white male, approximately 35
> years old, 5'6", 5'7" in height, short brown hair, no facial hair,
> approximately 160 pounds. . . .  The person was wearing jean shorts
> and a blue t-shirt. . . .  [Petitioner] matched that description.  Although
> Naspo originally stated that his assailant had "no facial hair," the
> surveillance tape showed that the person who attacked Naspo had a
> goatee. . . .  Hawk testified that when he saw [Petitioner] in the Sleepy's
> parking lot, [Petitioner] did have a goatee.  [Hawk] testified that when
> he [saw] [Petitioner] approximately 45 minutes after the attempted
> robbery, [Petitioner] was wearing []blue jeans and a large blue t-shirt[].
> Hawk testified that when he went to [Petitioner's] home to arrest him,

> the first clothing items that Hawk saw on the floor in [Petitioner's]
> bedroom were []a pair of . . . jeans and a[] . . . blue t-shirt.
>
>       *              *            *
>
> [Petitioner's] proximity to the scene of the crime also supports the
> sufficiency of the State's identification evidence. . . . [Police] stopped
> Petitioner approximately 150 yards from the gas station in question.

*Weber I*, 971 A.2d at 155-56; *see also Weber II*, 38 A.3d at 278.

Viewing this evidence – testimony of a police officer who has known Petitioner for over twenty years, surveillance video of the event, arrest photos, and Petitioner's courtroom appearance – in the light most favorable to the prosecution, a rational trier of fact could have identified Petitioner beyond a reasonable doubt.

### 2. Suggestive identification

Petitioner contends that the circumstances under which Officer Hawk identified him were impermissibly suggestive and, therefore, the trial court violated his due process rights by not screening "Hawk's testimony for reliability." (D.I. 105 at 105)  The Supreme Court has established a two-part test to evaluate whether a defendant's due process rights were violated by the admission of an out-of-court identification ("*Biggers* test").  *See Perry v. New Hampshire*, 565 U.S. 228, 238 (2012) (*citing Neil v. Biggers*, 409 U.S. 188 (1972)).  The first step requires determining if the challenged pretrial identification procedure was impermissibly suggestive.  *See Perry*, 565 U.S. at 238.  If the pretrial identification procedure is found to be impermissibly suggestive, then the second step of the *Biggers* test requires considering the totality of the circumstances to determine if the witness' identification was nonetheless reliable.  *Id.* at 239.  If, however, the first step of the *Biggers* test is not satisfied because the identification procedure was not unduly suggestive, then the defendant's due process rights are not violated by the admission of the out-of-court identification.  Rather, the

"reliability of properly admitted eyewitness identification, like the other parts of the prosecution's case, is a matter for the jury." *Foster v. California*, 394 U.S. 440, 443 n.2 (1969); *see also Perry*, 565 U.S. at 239. Significantly, however, the "Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Perry*, 565 U.S. at 248.

In this case, the Delaware Supreme Court framed Officer Hawk's identification under *Biggers*, noting that test normally addresses "a suggestion by police impressed upon a witness or victim to identify a suspect," not a situation in which a police officer knew the defendant already and was thereby purportedly conditioned to identify the defendant. *See Weber II*, 38 A.3d at 276-77 & n.19 (citing *Biggers*). The Delaware Supreme Court found Officer Hawk's identification was not subject to suggestion:

> First, Hawk encountered [Petitioner] not as a victim of crime but in Hawk's professional capacity as a police officer, with an open observant mind steeled against suggestion by training and experience. Second, independent of this investigation, Hawk had a 20 year base of familiarity with [Petitioner's] physical characteristics from which he could draw when assessing the surveillance footage.

*Weber II*, 38 A.3d at 277. After determining that the circumstances of the instant case did not constitute an impermissibly suggestive identification procedure, the Delaware Supreme Court proceeded to assess the reliability of Officer Hawk's identification of Petitioner under Delaware's "totality of circumstances" test:

> [T]he Sleepy's parking lot was well lit and Hawk had ample opportunity to observe [Petitioner's] physical characteristics shortly after the crime. Hawk reviewed the surveillance video and made his identification less than twenty-four hours after observing [Petitioner] in the parking lot. As noted above, Hawk also had familiarity with [Petitioner's] appearance before making the out of court identification. Hawk testified that he had met [Petitioner] several times before the current incident, dating back to 1984. Moreover, at trial, the jury had as evidence [Petitioner's]

40

> arrest photo and the surveillance footage, and could weigh the accuracy
> and reliability of Hawk's identification testimony for themselves. Taken
> together, these factors indicate that Hawk's identification of [Petitioner]
> was not unreliable.

*Id.* The Delaware Supreme Court held that the Superior Court properly admitted Officer Hawk's

testimony identifying Petitioner because "the identification was neither impermissibly suggestive nor

unreliable." *Id.*

The Delaware Supreme Court's decision that the trial court did not violate Petitioner's due

process rights by admitting Officer Hawk's identification was not contrary to, and did not involve an

unreasonable application of, United States Supreme Court precedent, namely the two-part test

derived from *Perry* and *Biggers*. The Delaware Supreme Court engaged in the type of thorough "fact-

specific inquiry" required under *Perry* and *Biggers* to determine if the identification procedure first

qualified as an "impermissibly suggestive" procedure implicating due process concerns. Once it

determined that Officer Hawk's identification of Petitioner was based on his twenty-years of

personal and professional knowledge of Petitioner's physical characteristics and was not the result of

an impermissibly suggestive police procedure, the Delaware Supreme Court could have properly

ended its due process inquiry under *Perry* and *Biggers*. Nevertheless, the Delaware Supreme Court

proceeded to consider the reliability of Officer Hawk's identification under Delaware's "totality of

circumstances" test, thereby going above and beyond the dictates of clearly established federal law.

Petitioner also asserts that the Delaware Supreme Court's decision was based on an

unreasonable determination of facts under § 2254(d)(2). (D.I. 1-2 at 21-22) Petitioner first claims

the Delaware Supreme Court unreasonably determined Officer Hawk "had a 20 year base of

familiarity with [Petitioner's] physical characteristics from which he could draw." *Weber II*, 38

A.3d at 277; (D.I. 1-2 at 21)  Petitioner does not dispute this ultimate fact, but takes issue with its

import: he argues that the "several" encounters between Petitioner and Officer Hawk since 1984

could have all been in 1984, or spaced out over the twenty years.  *Id.*  Petitioner also asserts the

factual determination that Officer Hawk had "an open observant mind steeled against suggestion by

training and experience" is not supported by the record.  (D.I. 1-2 at 22)  Petitioner, however, does

not provide any clear and convincing evidence to rebut either of the Delaware Supreme Court's

factual determinations.  Therefore, the Court must presume those factual determinations are correct.

*See* 28 U.S.C. § 2254(e)(1).

Accordingly, the Court concludes that the Delaware Supreme Court's decision that

Petitioner's due process rights were not violated by Officer Hawk's identification does not warrant

relief under § 2254(d).

### 3.  Absence of questioning regarding police officer's testimony during *voir dire*

Petitioner asserts that the jury pool should have been questioned about its ability to

impartially evaluate a police officer's credibility.  He contends that the absence of such questioning

violated his right to an impartial jury because the rest of the identification evidence was weak, and

Officer Hawk's identification was uncorroborated.  (D.I. 1-2 at 42)

"The Constitution . . . does not dictate a catechism for *voir dire*, but only that the defendant

be afforded an impartial jury.  Even so, part of the guarantee of a defendant's right to an impartial

jury is an adequate *voir dire* to identify unqualified jurors."  *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).

"Hence, the exercise of the trial court's discretion, and the restriction upon inquiries at the request

of counsel, are subject to the essential demands of fairness."  *Id.*

The record demonstrates that Petitioner did not request the trial court to ask potential jurors any such questions. (D.I. 2 at 3-5) The trial court did ask the jury pool, "Do you have any bias or prejudice either for or against the State or the defendant?" and whether they knew "Mark Hawk of the Delaware State Police." (*Id.* at 6) As the Delaware Supreme Court concluded, Officer Hawk's testimony was combined with Petitioner's arrest photo and the surveillance footage, such that the jury could weigh the accuracy and reliability of Hawk's identification testimony for themselves. *See Weber II*, 38 A.3d at 277. Given these circumstances, the Court concludes that the trial court's decision to proceed on broader *voir dire* questions regarding bias toward law enforcement, and toward Officer Hawk specifically, was not contrary to, or based on an unreasonable application of, *Morgan*.

### J.   Claim Eleven: Failure to Preserve Evidence and Provide Missing Evidence Instruction Violated Petitioner's Due Process Rights

In Claim Eleven, Petitioner contends that he was denied due process when law enforcement failed to gather and preserve the shirt he was wearing at the time of his arrest. Relatedly, Petitioner argues that the trial court should have issued a missing evidence instruction. The Delaware Supreme Court denied these arguments as meritless in *Weber II*. Therefore, Claim Eleven will only warrant habeas relief if the Delaware Supreme Court's decision was contrary to, or an unreasonable application of, clearly established federal law.

The clearly established federal law governing Petitioner's missing evidence argument is the standard articulated in *Arizona v. Youngblood*, 488 U.S. 51 (1988). In *Youngblood*, the United States Supreme Court held that the failure by police to preserve potentially useful evidence is not a denial of due process of law unless bad faith can be shown. *See id.* at 57-58. Potentially useful evidence is

43

"evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* at 57.

In Petitioner's case, the Delaware Supreme Court reviewed and denied the instant claim under *Lolly v. State*, 611 A.2d 956 (Del. 1992), rather than under *Youngblood*. *See Weber II*, 38 A.3d at 274-75. *Lolly* imposes a duty upon the State both to preserve and gather evidence that may be material to a defendant's guilt or innocence, whereas *Youngblood* only imposes a duty to preserve such evidence. *See* 611 A.2d at 960. As a result, in Delaware, a missing evidence instruction may be required when the State fails to gather evidence, not just when it fails to preserve evidence.[7] Considering that the Delaware Supreme Court applied a stricter standard than the one articulated in *Youngblood*, the Delaware Supreme Court's decision was not contrary to clearly established federal law.

The Delaware Supreme Court's decision also did not involve an unreasonable application of *Youngblood*. As the Delaware Supreme Court noted, Petitioner did not assert that the State acted in bad faith, one of the required elements of a *Youngblood* claim. *See Weber II*, 38 A.3d at 275-76, n.10. The Delaware Supreme Court's findings do not support a conclusion of bad faith:

> Hawk testified that at the time of his arrest, [Petitioner] had nothing on but his underwear. Hawk further testified that he grabbed the nearest clothing in [Petitioner's] room for [Petitioner] to put on before taking him to Troop 2. Hawk grabbed a blue shirt and a pair of blue jeans from the floor of [Petitioner's] bedroom. It was only for convenience's sake that Hawk grabbed the nearest clothing available, which happened to be a blue shirt and blue jeans. Other than the fact that the shirt was blue, the police had no reason to believe that the shirt [Petitioner] wore when arrested was the same shirt worn by the perpetrator depicted in the video surveillance footage. Furthermore, Detective James Spillion testified, that the blue shirt in the surveillance

---

[7]In Delaware, a missing evidence instruction is commonly referred to as a *Lolly* or *Deberry* instruction. *See Deberry v. State*, 457 A.2d 744 (Del.1983). A missing evidence instruction requires "the jury to infer that, had the evidence been preserved [or gathered], it would have been exculpatory to the defendant." *Lunnon v. State*, 710 A.2d 197, 199 (Del. 1998).

> footage displayed no identifying characteristics. Had it been the case
> that the shirt in the video and the shirt Hawk grabbed for [Petitioner]
> were in fact the same, that could not reasonably be interpreted as
> potentially exculpatory, because it would only serve to cement
> [Petitioner's] connection to the offense.

*Weber II*, 38 A.3d at 275. The Delaware Supreme Court's conclusion that law enforcement had no

duty to preserve the shirt did not involve an unreasonable application of clearly established federal

law. In turn, given the Delaware state courts' determination that the police did not have a duty to

preserve Petitioner's blue shirt, the Delaware Supreme Court's conclusion that the trial court

properly denied Petitioner's request for a missing evidence instruction was not based on an

unreasonable application of clearly established federal law, which required a finding of bad faith to

warrant a missing evidence instruction.

Petitioner also argues the Delaware state court decisions unreasonably determined the facts

based on the evidence adduced in the trial court proceeding. According to Petitioner, the

conclusion that the police grabbed the shirt "for convenience's sake" and that they had "no reason

to believe that the shirt [Petitioner] wore when arrested was the same shirt worn by the perpetrator

depicted in the video surveillance footage" is refuted by Officer Hawk's testimony identifying

photos of Petitioner taken in connection with his arrest. (D.I. 1-2 at 33) Officer Hawk's testimony,

however, only provides that Petitioner was photographed in the clothing he put on when he was

arrested; it does not link that clothing to the crime or video surveillance. Given Petitioner's failure

to provide clear and convincing evidence to the contrary, the Court must defer to the Delaware state

courts' factual finding that there was no evidence of bad faith in failing to preserve the shirt.

Accordingly, the Court concludes the Delaware Supreme Court's denial of Claim Eleven was

not contrary to, nor an unreasonable application of, clearly established federal law; nor was it based

upon an unreasonable determination of facts.

### K. Claim Twelve: IAC for Failing to Present Renunciation Defense

In Claim Twelve, Petitioner asserts that defense counsel's failure to comply with his explicit direction to present a renunciation defense and/or request a renunciation instruction violated his Sixth Amendment right to counsel. Petitioner premises this argument on two separate but related theories. First, he asserts that defense counsel's failure to follow his wishes warrants relief under *Strickland v. Washington*, 466 U.S. 688 (1984). Second, he contends that defense counsel's failure to comply with his wishes violated his right of client autonomy, which was recently recognized by the Supreme Court in *McCoy v. Louisiana*, 138 S.Ct. 1500, 1508 (2018).[8]

#### 1. *Strickland* ineffective assistance of counsel argument

Petitioner presented his ineffective assistance of counsel/*Strickland* argument to the Delaware state courts in his first Rule 61 proceeding. The Superior Court denied Petitioner's ineffective assistance of counsel/*Strickland* claim as meritless, and the Delaware Supreme Court affirmed that decision on the basis of the Superior Court's reasoning. Therefore, the *Strickland* argument in Claim Twelve will only warrant relief if the Superior Court's denial of Claim Twelve was either contrary to, or an unreasonable application of, clearly established federal law. *See Wilson*, 138 S. Ct. at 1193-94.

The clearly established federal law governing ineffective assistance of counsel claims is the two-pronged standard enunciated in *Strickland* and its progeny. *See Wiggins v. Smith*, 539 U.S. 510 (2003). Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's

---

[8]Petitioner did not assert his right to client autonomy argument in his first or second amended Petitions. (D.I. 58; D.I. 63) Instead, he presented the argument in a separate habeas petition in this Court. The Court administratively closed the separate 2019 case and stated that the argument should be raised in the instant proceeding since Petitioner was challenging the same 2004 conviction. *See Weber v. Metzger*, Civ. A. No. 19-697-MN, at D.I. 5 (D. Del. Aug. 8, 2019). Petitioner then presented the instant *McCoy* argument in his Supplement to the first amended Petition. (D.I. 113)

representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. *Strickland*, 466 U.S. at 688. Under the second *Strickland* prong, a petitioner must demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.* A court can choose to address the prejudice prong before the deficient performance prong, and reject an ineffective assistance of counsel claim solely on the ground that the defendant was not prejudiced. *See id.* at 698.

In order to sustain an ineffective assistance of counsel claim, a petitioner must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal. *See Wells v. Petsock*, 941 F.2d 253, 259-60 (3d Cir. 1991); *Dooley v. Petsock*, 816 F.2d 885, 891-92 (3d Cir. 1987). Although not insurmountable, the *Strickland* standard is highly demanding and leads to a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

The Superior Court denied Petitioner's argument that defense counsel provided ineffective assistance by failing to present a renunciation defense, explaining:

> [Petitioner] presented an "identity defense" and through counsel, argued that he was not the perpetrator of the crime. Although defendants may raise inconsistent defenses, in light of the fact that when presented at a show-up identification, the victim could not identify [Petitioner] as the man that assaulted him, it was certainly a reasonable strategy for trial counsel to present a defense to the jury that the wrong man was on trial. In order for trial counsel to present a renunciation defense, he would have had to directly contradict that strategy by admitting his client was there, but had chosen to walk away after failing to successfully rob the victim.
>
> [Petitioner] was convicted of Attempted First Degree Robbery and Attempted First Degree Carjacking, which required a showing that he

47

> intentionally engaged in a substantial step planned to culminate in the commission of the crime. The video surveillance and witness testimony showed that [Petitioner] walked up to the victim, grabbed him with both hands in an attempt to get the car keys, and told the victim he had a gun. It was only after the victim resisted that [Petitioner] walked away. The crime was therefore completed before [Petitioner] walked away and he did not voluntarily renounce his acts without intervention. A reviewing court should not second-guess the trial strategy of trial counsel. In light of the evidence presented, and the great weight and deference given to tactical decisions by the trial attorney, it was objectively reasonable for trial counsel to pursue the selected strategy. The evidence supported the convictions and it was not unreasonable for trial counsel to pursue a strategy of mistaken identity and omit a renunciation defense.

*State v. Weber*, 2017 WL 3638209, at *5 (Del. Super. Ct. Aug. 22. 2017).

With respect to the first prong of the § 2254(d)(1) inquiry, a "state court decision is contrary to clearly established federal law if it applies a rule that contradicts the governing law set forth in Supreme Court precedent, or if it confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from that reached by the Supreme Court." *Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013). Here, the Superior Court decision was not contrary to *Strickland* because it correctly identified the *Strickland* standard applicable to Claim Twelve. *See Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause.").

The Court must also determine if the Superior Court reasonably applied the *Strickland* standard to the facts of Petitioner's case. When performing the second prong of the § 2254(d) inquiry, the Court must review the Superior Court's decision with respect to Petitioner's ineffective assistance of counsel Claims through a "doubly deferential" lens.[9] *See Richter*, 562 U.S. at 105. The

---

[9]As explained by the *Richter* Court,

relevant question "is not whether counsel's actions were reasonable [but rather] . . . whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* In turn, when assessing prejudice under *Strickland*, the question is "whether it is reasonably likely the result would have been different" but for counsel's performance, and the "likelihood of a different result must be substantial, not just conceivable." *Id.* Finally, when viewing a state court's determination that a *Strickland* claim lacks merit through the lens of § 2254(d), federal habeas relief is precluded "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* at 101.

Defense counsel's failure to present a renunciation defense did not fall below an objective standard of reasonableness, because the facts did not support a renunciation jury instruction. Pursuant to 11 Del. Code § 541, "it is an affirmative defense that, under circumstances manifesting a voluntary and complete renunciation of the criminal purpose, the accused avoided the commission of the crime attempted by abandoning the criminal effort and, if mere abandonment was insufficient to accomplish avoidance, by taking further and affirmative steps which prevented the commission of the crime." Here, Petitioner's conduct did not comport with § 541, because Petitioner walked away from Naspo *after* attempting to steal his keys and threatening him. Thus, defense counsel did not perform deficiently by not pursuing an unavailable defense and instruction.

Petitioner also cannot demonstrate prejudice. Even if defense counsel had pursued the defense and instruction, Petitioner cannot demonstrate that the Superior Court would have given

---

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).

*Richter*, 562 U.S. at 105 (internal citations omitted).

the instruction, or that there is a reasonable probability that the outcome of his trial would have been different if the jury had been instructed on renunciation. Accordingly, the Court will deny the *Strickland* argument in Claim Twelve for failing to satisfy § 2254(d).

### 2. *McCoy* right of client autonomy argument

In *McCoy v. Louisiana*, the Supreme Court held that defense counsel's concession to his client's guilt in order to avoid the death penalty violated the defendant's right to autonomy. *See McCoy*, 138 S.Ct. at 1503 ("[The] Sixth Amendment guarantees a defendant the right to choose the objective of his defense and to insist that his counsel refrain from admitting guilt, even when counsel's experience-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty."). Autonomy claims are premised on violations of a defendant's "right to make the fundamental choices about his own defense." *Id.* at 1511. The "right to defend" granted to the defendant "personally" in the Sixth Amendment protects not only his right to self-representation,[10] but also ensures that if the defendant chooses to be represented by counsel he retains the "[a]utonomy to decide . . . the objective of the defense." *Id.* at 1508. A represented defendant surrenders control to counsel over tactical decisions at trial while retaining the right to be the "master" of his own defense. *See id.*; *see also Faretta*, 422 U.S. at 820. While counsel makes decisions concerning matters of trial management, such as "the objections to make, the witnesses to call, and the arguments to advance,"[11] the defendant has "the ultimate authority to make certain fundamental decisions regarding the case." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Fundamental decisions "are not strategic choices about how best to achieve a client's objectives; they are choices about what the client's objectives in fact are." *McCoy*, 138 S. Ct. at 1508. Autonomous decisions

---

[10] *See Faretta v. California*, 422 U.S. 806, 834 (1975).

[11] *Gonzalez v. United States*, 553 U.S. 242, 249 (2008).

that are reserved exclusively for defendant include whether to plead guilty, waive the right to a jury

trial, testify in one's own behalf, take an appeal, and admit guilt of a charged crime. *See id.*; *see also*

*Jones*, 463 U.S. at 751.

As explained by the Third Circuit:

> [I]n *McCoy v. Louisiana*, the Supreme Court clarified the line between
> tactical and fundamental decisions. On the one hand, **"strategic
> choices about how best to *achieve* a client's objectives"** are
> decisions for lawyers, so we review them for ineffectiveness. On the
> other hand, **"choices about what the client's objectives in
> fact *are*"** belong to defendants themselves, and violating defendant's
> right to make those choices is structural error.

*United States v. Wilson*, 960 F.3d 136, 143 (3d Cir. 2020) (emphasis in original).

Here, Petitioner contends that defense counsel's refusal to assert a renunciation defense

violated his right to client autonomy under *McCoy*. (D.I. 113) He states:

> It has been my firm and oft-repeated position that with respect to this
> matter, I never intended to consummate the offense of robbery – and
> that any intent I may have had was immediately renunciated in this
> three and seven-tenths of a second incident. . . . I never vacillated in
> my firm intent to pursue this line of defense. My trial attorney was
> very well aware of my intent and agreed to present the defense at the
> very start of trial preparations.
>
> &ast;       &ast;       &ast;
>
> The decision of whether to pursue the renunciation defense was thus
> reserved for [Petitioner] and only [Petitioner] to make. Defense
> counsel's last-minute refusal to honor [Petitioner's] firm decision to
> present this affirmative defense, a decision which was previously
> documented with the Court, constituted a "structural error" of
> [Petitioner's] autonomy.

(D.I. 113 at 5-6)

Petitioner presented his *McCoy*/right to client autonomy argument in his second Rule 61

proceeding. The Superior Court dismissed Petitioner's *McCoy*/client autonomy argument as

untimely under Rule 61(i)(1). By applying the procedural bars of Rule 61(i)(1), the Delaware

51

Supreme Court articulated a "plain statement" under *Harris v. Reed*, 489 U.S. 255, 263-64 (1984), that its decision rested on state law grounds. This Court has consistently held that Rule 61(i)(1) is an independent and adequate state procedural rule barring federal habeas review. *See, e.g., Trice v. Pierce*, 2016 WL 2771123, at *4 (D. Del. May 13, 2016). Therefore, the Court cannot review the merits of the instant *McCoy*/autonomy argument in Claim Twelve absent a showing of cause for the default, and prejudice resulting therefrom, or that a miscarriage of justice will occur if the claim is not reviewed.

Petitioner attempts to establish cause on the basis that he could not have raised the instant argument in his first Rule 61 motion because *McCoy* was not decided until 2018. Assuming, *arguendo*, that the right of client autonomy acknowledged in *McCoy* constitutes a newly created rule of constitutional law rather than an extension of an already existing rule, the timing of the *McCoy* decision does not establish cause or prejudice because the Supreme Court has not made *McCoy* retroactively applicable on collateral review. In turn, the miscarriage of justice exception to the procedural default doctrine does not apply to excuse Petitioner's procedural default, because he has not provided new reliable evidence of his actual innocence.

Even if Petitioner's right to client autonomy argument should not be considered as barred from review under the exhaustion doctrine, the argument does not entitle Petitioner to habeas relief. Once again, to the extent *McCoy* established a new constitutional right, Petitioner's instant argument is unavailing because the Supreme Court has not made *McCoy* retroactively applicable to cases on federal collateral review. To the extent *McCoy* did not establish a new constitutional right but, rather, expanded the existing right to effective assistance of counsel to include a client's right to autonomy, Petitioner's argument is unavailing because the facts of his case are distinguishable from the facts in *McCoy*'s case. In *McCoy*, defense counsel conceded McCoy's factual guilt with the hope of securing a

52

life sentence despite McCoy's goal of obtaining an acquittal. In Petitioner's case, defense counsel did not concede Petitioner's guilt and actually argued that Petitioner was not the perpetrator of the crime. *See Weber*, 2017 WL 3638209, at *5. When viewed in context with the evidence presented, it appears that defense counsel reasonably and tactically decided that pursuing an "identity defense" rather than a "renunciation defense" was more likely to obtain Petitioner's objective (*i.e.*, acquittal). Accordingly, the Court concludes that Petitioner's *McCoy*/client autonomy argument lacks merit and does not warrant relief.

### L. Claim Thirteen: Sentencing Enhancement Violated Due Process

Petitioner was convicted in July 2001 of second degree forgery and misdemeanor theft. He was sentenced to 30 days of imprisonment for each count. The 30-day sentence imposed by the Superior Court did not meet the jurisdictional minimum for appeals set by the Delaware state constitution. Therefore, Petitioner's appeal from those convictions was dismissed. *See Weber v State*, 812 A.2d 225 (Table), 2002 WL 31235418, at *1 (Del. Oct. 4, 2002).

The second degree forgery conviction was used as one of the predicate offenses to declare Petitioner an habitual offender. In Claim Thirteen, Petitioner argues that his due process rights were violated by using the 2001 second degree forgery conviction to enhance the sentence in this case because he had been denied the right to appeal that conviction.[12] The Delaware Supreme Court denied the argument in Claim Thirteen as meritless in Petitioner's initial direct appeal. *See Weber I*, 971 A.2d at 160. Petitioner subsequently presented the same argument to the Superior Court in a

---

[12] During the pendency of this proceeding, Petitioner filed a Motion to Bifurcate and/or Obtain a Summary Judgment on Claim Thirteen. (D.I. 119) The Court denied the Motion on March 31, 2022, but informed Petitioner that it would consider the argument in Claim Thirteen presented in that Motion when it considered his Petition as a whole. (*See* D.I. 122) The instant discussion of Claim Thirteen includes the argument presented in the Motion to Bifurcate/Obtain Summary Judgment.

motion for relief of judgment. The Superior Court denied the motion, and the Delaware Supreme Court affirmed that decision. *See Weber v. State*, 2019 WL 3268813, at *1 (Del. July 19, 2019) (rearg't denied Aug. 6, 2019). Given these circumstances, Claim Thirteen will only warrant relief if the Delaware Supreme Court's decisions were either contrary to, or an unreasonable application of, clearly established federal law.

In 2009 (*Weber I*), the Delaware Supreme Court rejected the same due process argument Petitioner presents in Claim Thirteen, explaining:

> [Petitioner] could have petitioned for post-conviction relief under Superior Court Criminal Rule 35, which provides that the Superior Court "may correct an illegal sentence at any time . . .," [Petitioner] has not explained why he did not seek Rule 35 relief. Had [Petitioner] sought Rule 35 relief and been denied, that denial would have been appealable to this Court.

> [Petitioner] also could have sought certiorari review of his Forgery conviction. The scope of certiorari review is limited but includes an examination of jurisdiction, errors of law, and mistakes on the face of the record. [Petitioner's] failure to pursue Rule 35 relief from his Forgery conviction or to seek a writ of certiorari patently detracts from [Petitioner's] due process claims.

> It is clear that the United States Constitution does not guarantee a right to appeal a state law criminal conviction. The United States Supreme Court, however, has specifically held that "the States must afford prisoners some 'clearly defined method by which they may raise claims of denial of federal rights.'" Although the United States Supreme Court has held that the right to appellate review of predicate offenses is not required to enhance a sentence under a recidivism statute, that Court has not made a similar pronouncement with respect to sentencing enhancements. Rather, the Court currently appears to rely on the "numerous opportunities to challenge the constitutionality of [predicate] convictions [in state courts]" as sufficient to protect the due process rights of criminal defendants. Here, [Petitioner] could have asserted his federal rights in State Court through a motion for post-conviction relief or a writ of certiorari.

> We conclude that [Petitioner's] 2001 conviction for Forgery Second is
> a conviction for purposes of the habitual offender statute, and that the
> unavailability of a direct appeal does not change this result.

*Weber I*, 971 A.2d at 159-60 (cleaned up).

The Delaware Supreme Court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law. Although States must provide prisoners some "clearly defined method by which they may raise claims of denial of federal rights,"[13] "there is no federal constitutional right to state appellate review of state criminal convictions." *Estelle v. Dorrough*, 420 U.S. 534, 536 (1975). As the Delaware Supreme Court explicitly and thoroughly noted in its decision, even though Petitioner was precluded from appealing his 2001 forgery conviction directly to the Delaware Supreme Court, he could have challenged his forgery conviction via two other post-conviction vehicles. The existence of these alternate avenues of review undercuts his instant due process argument. Therefore, the Court concludes that the Delaware Supreme Court's denial of Claim Thirteen does not warrant relief under § 2254(d).

In addition, the Supreme Court has held that, when a state prisoner's current sentence was enhanced due to a previous unconstitutional conviction, habeas review of the enhanced current sentence is generally unavailable when the previous conviction is

> no longer open to direct or collateral attack in its own right because
> the defendant failed to pursue those remedies while they were available
> (or because the defendant did so unsuccessfully), the conviction may
> be regarded as conclusively valid. If that conviction is later used to
> enhance a criminal sentence, the defendant generally may not challenge
> the enhanced sentence through a petition under § 2254 on the ground
> that the prior conviction was unconstitutionally obtained.

*Lackawanna Cnty. Dist. Att'y v. Coss*, 532 U.S. 394, 402-04 (2001). The only exception to this rule expressly recognized by the Supreme Court is for a claim that the prior conviction was

---

[13] *Young v. Ragen*, 337 U.S. 235, 239 (1949).

unconstitutional because there was a failure to appoint counsel in violation of the Sixth Amendment right to counsel as set forth in *Gideon v. Wainwright*, 372 U.S. 335 (1963). *See Lackawanna*, 532 U.S. at 404; *Daniels v. United States*, 532 U.S. 374, 382 (2001). In this case, Petitioner did not pursue collateral remedies for his 2001 forgery conviction and he does not raise a Sixth Amendment claim in connection with his 2001 forgery conviction. Therefore, the Court alternatively denies Claim Thirteen for failing to state an issue cognizable on federal habeas review.

### M. Claim Fourteen: Use of 2001 Forgery Conviction to Enhance Sentence Violated Equal Protection Rights

In Claim Fourteen, Petitioner contends that the State violated his right to equal protection by using the 2001 forgery conviction to enhance his sentence, because the forgery offense could have been charged as misdemeanor or felony. He asserts, "[c]omparing [Petitioner's] absence of any right to a direct appeal against the State's 'absolute right to appeal' leads to the ineluctable conclusion that he was not afforded equal protection of the law in his forgery case since superior appeal rights were available to the State." (D.I. 58-3 at 6)

Petitioner presented this argument to the Superior Court in his Rule 61 motion, which denied the argument as procedurally barred. *See Weber v. State*, 197 A.3d 492 (Table), 2018 WL 5993473, at *1 (Del. Nov. 13, 2018). On post-conviction appeal, the Delaware Supreme Court did not address the Superior Court's procedural ruling but, instead, denied the instant equal protection argument as meritless. *See id.* Given these circumstances, Claim Fourteen will only warrant habeas relief if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

"[T]he concept of equal protection as embodied in the Due Process Clause of the Fifth Amendment does not require that all persons be dealt with identically, but rather that there be some

56

'rational basis' for the statutory distinctions made, or that they 'have some relevance to the purpose for which the classification is made.'" *Marshall v. United States*, 414 U.S. 417, 422 (1974) (cleaned up). "Under traditional equal protection principles, distinctions need only be drawn in such a manner as to bear some rational relationship to a legitimate state end. Classifications are set aside only if they are based solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify them." *Clements v. Fashing*, 457 U.S. 957, 962–63 (1982). Courts deviate from traditional equal protection principles, however, and apply strict scrutiny if the challenged statute discriminates against a suspect class of persons or burdens the exercise of a fundamental constitutional right in a discriminatory manner. *See id.* at 963.

When denying Claim Fourteen, the Delaware Supreme Court opined:

> In 2001, [Petitioner] was convicted of a felony for the forgery of a $300 check, which served as one of the predicate offenses supporting the Superior Court's determination that he was a habitual offender. [Petitioner] argues that his equal protection rights were violated because, (1) after his conviction for forgery, he had different appeal rights than the State of Delaware would have had, and (2) had he been instead convicted for unlawful use of a payment card, which is only a misdemeanor, such a conviction would not have served as a predicate felony to support the Superior Court's determination that he was a habitual offender. There is, however, an obviously rational basis for the General Assembly to draw distinctions between the appeal rights of convicted offenders and the State's appeal rights in criminal cases. Likewise, there is an obviously rational basis for the General Assembly to determine that the unlawful use of a payment card is a less serious offense than check forgery. It was therefore objectively reasonable for his trial counsel to refrain from making this meritless equal protection claim.

*Weber*, 2018 WL 5993473, at *1.

In this proceeding, Petitioner contends that the Delaware Supreme Court's decision is contrary to, and an unreasonable application of, clearly established federal law, because the Delaware Supreme Court "failed to consider the controlling United States Supreme Court Law" as set forth in

57

*Skinner v. Oklahoma*, 316 U.S. 535 (1942).  (D.I. 58-2 at 29)  In *Skinner*, after applying strict scrutiny, the Supreme Court held a sterilization law that applied to a class of "habitual criminals," but not to another class who had committed the same quality of offense, violated the Equal Protection Clause of the 14th Amendment.  *See id.* at 541.  Explaining that "[m]arriage and procreation are fundamental to the very existence and survival of the race," the *Skinner* Court held that strict scrutiny applied because the "legislation . . . involves one of the basic civil rights of man."  *Id.* at 541.

Petitioner appears to argue that the Delaware Supreme Court should have applied strict scrutiny when reviewing the different appeal rights afforded to him and the State in the forgery case. His argument is unavailing.  Since Petitioner's case did not involve a fundamental right, strict scrutiny review of Delaware's forgery and unlawful use of a credit card statutes was not required, nor was strict scrutiny review of the different appeal rights for convicted offenders and the State's appeal rights in criminal cases.  As the Delaware Supreme Court held, there was a rational basis to draw distinctions between the appeal rights of convicted offenders and the State, and there was a rational basis for determining  that the unlawful use of a payment card is a less serious offense than check forgery.  Accordingly, Claim Fourteen does not warrant habeas relief.

### N.  Claim Fifteen: IAC Failure to Advise Petitioner of Habitual Status

In Claim Fifteen, Petitioner contends that defense counsel provided ineffective assistance by failing to advise him that, if he were to be convicted of attempted robbery, he was eligible to be sentenced as an habitual offender under 11 Del. Code § 4214(a).  Petitioner asserts that he would have accepted a plea offer made by the State had he been aware of his habitual offender status.

The State contends that Claim Fifteen is procedurally defaulted because Petitioner did not raise it in the state courts in his post-conviction proceedings.  Petitioner concedes he did not exhaust

state remedies.  The State also contends that Petitioner's argument is meritless.  In an exercise of judicial efficiency, the Court will proceed to the merits of the Claim.

In 2005, after a jury found Petitioner guilty of attempted robbery and attempted carjacking, the State moved to have him declared an habitual offender pursuant to 11 Del. Code § 4214(a). Defense counsel filed a response in opposition to the State's motion.  The Superior Court granted the State's motion and sentenced Petitioner as an habitual offender.  Petitioner appealed, and the Delaware Supreme Court remanded the case for a new trial.  Prior to his second trial in 2010, the State made plea offers that did not contemplate having Petitioner being declared an habitual offender.  At that juncture, Petitioner clearly knew about his status as an habitual offender, having been already declared an habitual offender in the same case.  Petitioner nonetheless rejected the State's offers and elected to go to trial.  After he was convicted a second time, Petitioner moved to enforce the prior plea offer made by the State.  Denying Petitioner's motion, the Superior Court recounted the sequence of events as follows:

> The defendant seeks to enforce the original plea offer made to him by the State.  This plea agreement would have required the defendant to plead guilty to Attempted Robbery Second and the State would recommend a sentence of five years at level five.  In response, the defendant requested the State to agree that he was entitled to credit time of approximately two years.  The State refused to agree, and the original offer was rejected.  A few days later, in response to defendant's credit time request, the State modified its offer and agreed that the defendant could receive the credit time but in doing so would increase its Level 5 recommendation to seven years.  This would ensure the defendant would serve the five years the State was seeking.  The defendant rejected the modified offer and the case proceeded to trial.

*Weber*, 2010 WL 5343153, at *1.

The fact that Petitioner had already been declared an habitual offender following his first conviction demonstrates that Petitioner was aware of his status as an habitual offender when he

rejected the State's subsequent plea offers presented prior to his second trial in 2010. Petitioner

does not provide any evidence to support his statement that defense counsel advised him that he

was not an habitual offender. Accordingly, the Court will deny Claim Fifteen as meritless.

### O.  Claim Sixteen: 11 Del. Code § 4214 is Unconstitutionally Vague

Next, Petitioner argues that his conviction for attempted robbery is not an offense that

qualified him for habitual offender treatment under 11 Del. Code § 4214(a). He asserts that the

absence of the term "attempt" in subsection (a) of the 2004 version of the statute that was applied in

his case renders it "unconstitutionally vague and ambiguous." (D.I. 58-3 at 21; D.I. 117 at 5)

According to Petitioner, the fact that the 2016 version of § 4214(c) "is the equivalent of

§ 4214(a)(2004) with the exception that" the 2016 version of § 4214(c) includes the word "attempt"

demonstrates that the State and Delaware General Assembly "recognized the merits of [his] claim

that the statute was vague and ambiguous."[14]  (D.I. 117 at 6-7)

It is well-established that "[s]tate courts are the ultimate expositors of state law," and claims

based on errors of state law are not cognizable on habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67-

68 (1991). Although Petitioner couches a portion of the instant argument in constitutional terms,

the essence of his argument is that the Superior Court misapplied the habitual offender

enhancement in his case. The Delaware Supreme Court has previously rejected the same argument

Petitioner makes here, and held that attempted robbery is a qualified offense under § 4214:

> Under Del. Code Ann. tit. 11, § 531, an "[a]ttempt to commit a crime
> is an offense of the same grade and degree as the most serious offense
> which the accused is found guilty of attempting." Moreover, under
> Del. Code Ann. tit. 11, § 832(c), a twenty-year Level V sentence

---

[14]During the pendency of this proceeding, Petitioner filed a Motion for Partial Summary Judgment on Claim Sixteen (D.I. 117) and  Motion to Bifurcate Claim Sixteen (D.I. 119). The Court denied both Motions on March 31, 2022, but informed Petitioner that it would consider the supplemental argument to Claim Sixteen presented in those Motions when it considered his Petition as a whole. (*See* D.I. 122)  The Court's instant discussion of Claim Sixteen includes his supplemental argument.

> "appl[ies] to attempted robbery in the first degree as well as robbery in
> the first degree." Because Robbery in the First Degree carries a
> statutory maximum of twenty years' incarceration at Level V, the
> Superior Court was required, at a minimum, to impose the twenty-year
> Level V maximum sentence for attempted robbery, once Harris had
> been declared an habitual offender.

*Harris v. State*, 840 A.2d 1242, 1243-44 (Del. 2004). In short, Petitioner's challenge to the Superior

Court's interpretation and application of well-settled Delaware law does not present an issue

cognizable on federal habeas review. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("Federal habeas

corpus relief does not lie for errors of state law."); *Johnson v. Rosemeyer*, 117 F. 3d 104, 109 (3d Cir.

1997) ("[A] state court's misapplication of its own law does not . . . raise a constitutional claim"); *see*

*also Mullaney*, 421 U.S. at 691 ("Federal courts entertaining petitions for writs of habeas corpus are

bound by the construction placed on a State's criminal statutes by the courts of that State"). 

Therefore, the Court will deny Claim Sixteen for failing to assert a proper basis for federal habeas

relief.

## P. Claim Seventeen: Overall Ineffective Assistance of Counsel

In his final Claim, Petitioner asserts "[i]nsofar as Grounds I through XI in the original and

amended petitions and Grounds XII through XVI in the supplemental petition implicate ineffective

assistance of counsel, [Petitioner] hereby raises that claim. . . . [Petitioner] requests the opportunity

to brief this claim in the event if it is feasible to do so." (D.I. 58-4 at 11) The State responds that

Petitioner's conclusory and vague allegation warrants summary dismissal. (D.I 77 at 11) Petitioner's

Traverse, filed nine months after the State's assertion that Claim Seventeen is too vague to warrant

relief, does not provide any additional briefing for Claim Seventeen. (D.I. 105 at 146-47) Instead,

Petitioner references his voluminous filings (exceeding 400 pages) in an apparent attempt to justify

his failure to plead his ineffective assistance of counsel claim with sufficient particularity. (D.I. 105

at 147)  Petitioner also concedes he never presented Claim Seventeen to the Delaware state courts,

but avers that he is excused from any exhaustion requirements because "postconviction ineffective

assistance of counsel claims are not cognizable in Delaware courts." (D.I. 105 at 146)  He argues:

> Was [Petitioner] required to add another 30-pages just to argue the
> *Strickland* test which simply asks the questions of whether the default
> constituted error on the part of counsel and whether [he] suffered
> prejudice as a result?  Has the criminal justice system's acumen
> deteriorated to such a level that such hyper-technical nuances are
> valued more than common-sense truth, and justice?

(D.I. 105 at 147)

Petitioner's general reference to any alleged arguments implicating ineffective assistance of

counsel throughout his voluminous filings is not sufficiently specific to avoid summary dismissal,

especially when compared with his allegations of ineffective assistance in Claims Twelve and Fifteen.

The Court cannot speculate as to the particular arguments and facts Petitioner would assert to

support his general overall allegation of ineffective assistance, nor can the Court speculate as to how

Petitioner would demonstrate prejudice caused by counsel's alleged ineffective assistance.  If the

Court were to consider Petitioner's general ineffective assistance allegation as presented, the Court's

determination that the Claims in the Petition lack merit would preclude finding ineffective assistance

with respect to those issues.  *See, e.g., United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999) ("There

can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a

meritless argument.").

Moreover, it is Petitioner's burden to demonstrate cause and prejudice to overcome his

failure to exhaust state remedies for Claim Seventeen, and his statement that he is excused from any

exhaustion requirements with respect to any ineffective assistance on the part of post-conviction

counsel does not approach the threshold requirement.  *See Coleman v. Thompson*, 501 U.S. 722, 750

(1991) (explaining that petitioner has burden of demonstrating cause and prejudice).  Thus, the

Court concludes that Claim Seventeen does not warrant habeas relief.

## V.     MOTION

Petitioner has filed a Motion to Expand the Record in order to provide background

information concerning Claim Eight.  (D.I. 124)  The Court will grant the Motion, and notes that it

considered the background information when it addressed Petitioner's contentions in Claim Eight.

## VI.    CERTIFICATE OF APPEALABILITY

A district court issuing a final order denying a § 2254 petition must also decide whether to

issue a certificate of appealability.  *See* 3d Cir. L.A.R. 22.2 (2011); 28 U.S.C. § 2253(c)(2).  A

certificate of appealability is appropriate when a petitioner makes a "substantial showing of the

denial of a constitutional right" by demonstrating "that reasonable jurists would find the district

court's assessment of the constitutional claims debatable or wrong."  28 U.S.C. § 2253(c)(2); *see also*

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court has concluded that the instant Petition does not warrant relief.  Reasonable jurists

would not find this conclusion to be debatable.  Accordingly, the Court will not issue a certificate of

appealability.

## VII.   CONCLUSION

For the reasons discussed, the Court will deny the Petition without holding an evidentiary

hearing.  An appropriate Order will be entered.